OSCN Found Document:IN THE MATTER OF B.K.

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 
 Court Dockets
 

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 IN THE MATTER OF B.K.
2017 OK 58
Case Number: 114486
Decided: 06/27/2017
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2017 OK 58, __ P.3d __

 

IN THE MATTER OF B.K., ADJUDICATED DEPRIVED CHILD

LAFARAH WILLIAMS , Appellant/Respondent,
v.
STATE OF OKLAHOMA, Appellee/Petitioner.

CERTIORARI TO THE COURT OF CIVIL APPEALS DIVISION II 
ON APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY,
STATE OF OKLAHOMA
HONORABLE CASSANDRA M. WILLIAMS, TRIAL JUDGE

¶0 The State filed a petition to terminate Mother's parental rights pursuant to 10A O.S.Supp.2014, § 1-4-904(B)(5), alleging Mother failed to correct the conditions that led to the deprived child adjudication of B.K. A jury returned a verdict that found Mother failed to correct those conditions. The trial court entered judgment on the verdict and terminated Mother's parental rights to B.K. Mother appealed. Upon review, a majority of Division II of the Court of Civil Appeals reversed the judgment of termination. The Court observed that the undisputed evidence revealed Mother's mental disorder was the cause of B.K. being adjudicated deprived, not deficiencies in parenting. The majority opinion held that any termination must be based on the mental health ground found in 10A O.S.Supp.2014 § 1-4-904(B)(13) and, therefore, it was fundamental error to terminate pursuant to 10A O.S.Supp. 2014 § 1-4-904(B)(5). The State of Oklahoma petitioned this Court to grant certiorari review of the Court of Civil Appeals opinion. We have previously granted the State's petition.

CERTIORARI PREVIOUSLY GRANTED; OPINION OF THE COURT OF CIVIL
APPEALS VACATED; JUDGMENT ON THE JURY VERDICT AFFIRMED

Linque Hilton Gillett, LINQUE HILTON GILLET LAW OFFICE, P.L.L.C., Oklahoma City, Oklahoma for Appellant/Respondent
Jaclyn Rivera, Assistant District Attorney, OKLAHOMA COUNTY DISTRICT ATTORNEY'S OFFICE, Oklahoma City, Oklahoma, for Appellee/Petitioner
Tracey D. Jordan Esaw, Assistant Public Defender, OKLAHOMA COUNTY PUBLIC DEFENDER, Oklahoma City, Oklahoma, for the Minor Child B.K.

REIF, J.

¶1 A single question is presented for decision on certiorari review: did the Legislature intend 10A O.S.2011, § 1-4-904(B)(13)[1] to be the exclusive ground for termination in cases where a parent has a "diagnosed cognitive disorder" or can such a disorder be a "condition" leading to a deprived adjudication that a parent must correct under 10A O.S.2011, § 1-4-904(B)(5)[2]? This question arises in the case at hand because four-year-old B.K. was removed from the home as the result of a delusional episode in which Mother believed the police had planted listening devices in B.K.'s ears to spy on Mother. This delusional episode was reported to police by B.K.'s seventeen-year-old brother. Both a psychologist and a psychiatrist diagnosed Mother as having a delusional persecution disorder that medication would help control. When Mother said she would not take medication for the delusional disorder, the State pursued termination of Mother's parental rights because B.K. had been in DHS foster care for over 36 months.

¶2 The trial court allowed the State to proceed under the general "failure to correct" provision in subsection 1-4-904(B)(5) and terminated Mother's parental rights upon a jury verdict that recommend same. A majority of Division II of the Court of Civil Appeals reversed, ruling the more specific ground addressing cognitive disorders in subsection 1-4-904(B)(13) was the exclusive and applicable ground for termination. The majority further ruled that allowing the State to proceed under the general ground was fundamental error. Upon certiorari review, we vacate the majority opinion of the Court of Civil Appeals, and hold (1) subsection 1-4-904(B)(13) does not exclusively apply, and (2) the trial court did not err in terminating Mother's parental rights based on subsection 1-4-904(B)(5)

¶3 The case at hand is the first opportunity for this Court to address the interplay between subsections 1-4-904(B)(5) and 1-4-904(B)(13). The Court of Civil Appeals has previously addressed this issue in two published opinions - In the Matter of R.A., 2012 OK CIV APP 65, 280 P.3d 366 and In the Matter of C.R.T., 2003 OK CIV APP 29, 66 P.3d 1004. In both of these cases, the Court of Civil Appeals concluded the respective trial courts erred in terminating parental rights for failure to correct the conditions under subsection 1-4-904(B)(5). In each case, the evidence revealed mental illness was the uncorrected "condition." The State did not seek certiorari review in either case.

¶4 In the R.A. case, the Court of Civil Appeals noted that the trial court terminated mother's parental rights for failure to correct her substance abuse problem, when the evidence showed "the actual 'condition' Mother needs to correct [is] her mental illness." R.A., ¶ 33, 280 P.3d at 375. The court further noted that mother's Individualized Service Plan "failed to effectively offer Mother the 'opportunity to ameliorate [her] condition and to effectively defend against termination efforts' by failing to adequately address her mental illness." Id., ¶ 34, 280 P.3d at 375. In contrast, Mother's delusional condition herein has always been the "actual condition" addressed by the Individualized Service Plan, and the Oklahoma Department of Human Services has offered and provided services to "ameliorate" this condition.

¶5 In the C.R.T. case, the Court of Civil Appeals observed that "Mental illness was the basis for the deprived child adjudication and remained as mother's problem to the time of trial." C.R.T., ¶ 21, 66 P.3d at 1010. The court further observed that "the overwhelming evidence here shows that the alleged failure to correct the condition follows and flows directly from the condition itself." Id. To be sure, the case at hand presents circumstances more like those in C.R.T., in that the psychological evaluations herein predicted that Mother would deny that she was delusional and would decline to take medication. This is not, however, "overwhelming evidence" that her failure to correct the delusional condition "follows and flows directly from the condition itself."

¶6 The "overwhelming evidence" in the case at hand is that Mother understood why medication was recommended and, more importantly, specifically agreed to follow the recommendations in the mental health evaluations. It was not necessary for Mother to like or agree with these recommendations, any more than it was necessary for her to like or agree with other requirements in the Individualized Service Plan. While the law must respect her choice in this regard, and cannot force her to take medication, the law must be equally ready to enforce the consequences of that choice insofar as the future and best interests of B.K. are concerned.

¶7 While R.A. and C.R.T. reached just results, they are of little help in deciding whether the Legislature intended subsection 1-4-904(B)(13) to apply exclusively in cases where the parent has a "diagnosed cognitive disorder," or can subsection 1-4-904(B)(5) also be used to terminate parental rights when such disorder is the condition that caused the child to be adjudicated deprived. The answer to this problem cannot be so easily found by applying the rule that a specific statute governs over a general statute, as R.A. and C.R.T. suggest. The answer depends upon the ends or purposes that the Legislature seeks to achieve in the "termination statutes."

¶8 It has long been recognized that "'the termination statutes . . . attempt to provide for protection of the parent's constitutional right to due process.'" Matter of Lyni P., 1981 OK 35, ¶ 6, 626 P.2d 864, 866 (overruled on other grounds, citation omitted). "Final termination can be reached [1] only after the parent has been appraised of those conditions which caused the adjudication of the child as deprived and [2] only after the parent has been allowed time to attempt to correct those conditions." Id. ¶ 7, 626 P.2d at 866. These are the ends or purposes the termination statutes seek to achieve.

¶9 As the case at hand aptly illustrates, a mental or cognitive disorder can be a "condition" that causes the adjudication of a child as deprived under both subsection 1-4-904(B)(5) and subsection 1-4-904(B)(13). Each of these subsections equally fulfills the "notice purpose" for a parent with a mental or cognitive disorder. Both also equally protect the child from the inability of a parent to adequately and appropriately exercise parent responsibility.

¶10 In addition, both subsections allow time to attempt to correct the condition. Each of these subsections fulfills the "opportunity-to-correct purpose." Moreover, there is no conflict between the requirement in 1-4-904(B)(5) that a parent be allowed at least three months to correct the condition and the requirement in 1-4-904(B)(13) allowing a reasonable time considering the age of the child. In either case, the exact amount of time that should be afforded depends on the facts of the case.

¶11 To be sure, subsection 1-4-904(B)(13) does have the additional restriction that the cognitive disorder shall not in and of itself deprive the parent of parental rights. This restriction, however, is a limitation on the court's power to terminate and not a matter that a jury or trier of the fact need to determine.

¶12 In the final analysis, the State gains no advantage, and the parent with a cognitive disorder suffers no disadvantage, whichever subsection the State invokes to pursue termination. In addition, construing and applying these subsections as complementing one another better protects the best interests of a deprived child as well. A particular instance of this is found in the provision in subsection 1-4-904(B)(13), that a parent's refusal or noncompliance with treatment, therapy, medication or assistance from outside the home can be used as evidence that the parent is incapable of adequately and appropriately exercising parental responsibility. Such evidence would be equally relevant in a failure to correct termination proceeding pursuant to 1-4-904(B)(5), like the case at hand.

¶13 Rather than split hairs over technical differences in these subsections, the interests of both Mother and B.K. are better served by scrutinizing the record, and determining whether clear and convincing evidence supports the judgment on the jury's verdict recommending termination of Mother's parental rights to B.K. At the outset, it should be noted that Mother did not object to the State pursuing termination pursuant to 1-4-904(B)(5), or claim that she was misled concerning the "condition" she failed to correct to support termination.

¶14 Four-year-old B.K. and his seventeen-year-old brother M.J. were removed from Mother's home on August 8, 2012. The court issued an order on August 9, 2012, authorizing the Oklahoma Department of Human Sevices (ODHS) to assume emergency custody of these children. The affidavit in support of the emergency custody order stated Mother "was delusional and not able to care for the children." The affidavit recounted that M.J. called the police to report that Mother "began thinking that [B.K.] had wired [sic] tapping bugs in his ears that were planted by the government." The affidavit further recounted that the police had been out to the home six times in the last two months. One of the officers reported that he had offered Mother help for her mental health and she has denied the services.

¶15 In the pre adjudication Individualized Service Plan, dated November 7, 2012, the case worker related (1) "[Mother] continues to say she thinks her house and her phone are bugged and that the house has cameras in it, that some one continues to spy on her;" (2) "[Mother] has stated people on [sic] following her on the bus, and has concerns with people at her work;" and (3) "[Mother] seems to be very paranoid."

¶16 On April 4, 2013, Mother stipulated to B.K. being adjudicated deprived. At the subsequent disposition hearing on May 11, 2013, the court approved an Individualized Service Plan (ISP) for Mother to regain custody of B.K. Under the heading "Conditions or Behaviors which Need to be Changed or Corrected," the ISP states: "Mother needs to maintain stability of mental health so she can take care of her child in an appropriate manner." The ISP further required Mother "to have her mental health under control in order to provide a safe and secure home for [B.K.] in which to live."

¶17 The ISP also addressed three specific risk factors relating to Mother's mental health. The first mental health risk factor concerned Mother's past use of medication for migraine headaches and the potential for this medication to cause delusions and paranoia. The second mental health risk factor concerned the need for a psychological evaluation. This risk factor contained a specific direction that Mother "will follow the recommendations set forth by the psychologist as ordered by the court." The third mental health risk factor concerned Mother "[seeing] a psychiatrist to complete a medication evaluation or assessment."

¶18 The first risk factor was not fully addressed and ultimately abandoned by the court, because Mother did not provide a sufficient history to the evaluating doctor and did not continue to experience migraine headaches after B.K.'s adjudication. The second risk factor was addressed on September 21, 2012, when Mother completed a psychological evaluation. This evaluation included testing that indicated Mother had (1) Obsessive-Compulsive Personality Disorder, (2) Dementia Disorder, and (3) Delusional Disorder-paranoid type. Mother also participated in individual counseling with a therapist who stated Mother would benefit from seeing a psychologist for possible medications to assist her with her mental health.

¶19 In a subsequent clinical assessment on October 14, 2013, the clinician/assessor recommended a psychiatrist evaluation for possible medical management and continuing individual therapy. This clinician/assessor advised Mother's case worker that Mother displayed "impairment in reality testing" and predicted Mother would tell a psychiatrist that "she does not need any medication as she states she has no mental health needs."

¶20 The Progress Report for June 2014 reflected that "pursuance of neurological issues would not continue, that mental health track would be followed." This report also related "[M]other is doing well in therapy and has not shown any sign of delusions." This observation was also recorded in the Progress Report for September 2014; however, the report also noted "[Mother] has not made any progress as to why the children came into custody [and] has said that this is all a misunderstanding and that the reports are not true."

¶21 The September 2014 Progress Report further observes "[Mother] has not been open with her therapist as to the petition, why her children came into DHS custody." The Court's Permanency/Review Order issued December 2014 similarly expressed concern that "mother, after three separate court hearings, refuses to address the issues of why [B.K.] was removed from her home."

¶22 The December 2014 Permanency/Review Order also recorded that "[Mother] had put her therapist into her delusional process." The order relates that Mother accused her therapist of working with the police and the CIA, and is allowing the police to listen in on counseling sessions. The Permanency/Review Order further states that Mother told her case worker (1) "the police are turning people against her," (2) that she believed "the bus driver was lying to the police about her" and (3) her son M.J. was taken from his bedroom one night and "the police put lies into his head and he hasn't been the same since."

¶23 A second psychological evaluation conducted on April 16, 2015, indicated the presence of "persecutory delusions" and that Mother's delusional thinking has not improved significantly despite individual therapy. The evaluating psychologist concluded that Mother "would benefit from rapid implementation of supportive therapeutic measures including individual psychotherapy and psychopharmacological intervention (medication) to diminish paranoid delusions." The Progress Report of April 23, 2015, concurs that "[Mother] needs to see a psychiatrist and become med compliant."

¶24 The Progress Report of October 22, 2015 stated Mother disputed the psychologist's diagnosis, because it "came from a DHS psychologist that DHS pays to say whatever it is DHS wants." This Progress Report also incorporated the recommendation of the psychiatrist who evaluated Mother on October 8, 2015. The psychiatrist stated Mother could benefit from medication treatment, but Mother told the psychiatrist that she will not take medication because she does not think she needs it. This response was predicted in the clinical assessment back in October of 2014.

¶25 When it became apparent that Mother would not follow the recommended course of treatment, the State sought to terminate Mother's parental rights to B.K. for failure to correct the conditions that led to B.K. being adjudicated deprived. The case was tried to a jury on November 17 and 18, 2015, some 39 months after B.K. was removed from Mother.

¶26 At trial, Mother was given a full and fair opportunity to tell the jury about the things she believed the police had done to her and her children, and the reason for the police to do those things. Mother related that she believed the police had tried to kill her on three occasions - twice while she was riding on a bus and once after she had exited the bus. In each of the episodes on the bus, Mother related that some one sitting behind her put an unknown substance down her back that caused her to have spasms and become numb. She stated that she believed the bus driver had been paid a large sum of money to allow these attacks to occur. She also related that after getting off the bus one day, a female plain clothes police officer (whom she had earlier encountered at the bus stop) drove by in a car and shot at her.

¶27 Mother also related that the police would park outside her apartment to watch her, and they would harass M.J. when he took the trash out. Mother testified a police officer even took M.J. overnight on one occasion. Mother also believed the police tried to plant some one at her work at Home Depot to watch her and that the manager at her Jack in the Box employment offered a reward for anyone who could get her arrested. Mother believed the police had spread a rumor at Jack in the Box that she was involved in espionage.

¶28 Mother told the jury the reason the police are after her is that she was a witness to police corruption in setting up a friend of hers with illegal drugs. Mother claimed to have evidence that would exonerate her friend and that the police did not want the evidence to come out.

¶29 Mother acknowledged that both a psychologist and psychiatrist had told her she could benefit from medication for the delusional disorder. Mother related that she rejected these recommendations because "to be medicated is dismissing everything that they've done to my children." Mother also believed that if she took medication the she'd become a "walking zombie," and that she knew "to shut people up . . . when you witness police corruption they want to medicate you." When asked if she had agreed to follow the recommendations based on her psychological evaluations, Mother insisted that she had followed "every single recommendation . . . with the exception of physically ingesting an oral substance, a medication."

¶30 Mother indicated she understood that declining to take medication for the diagnosed delusional disorder was one of the reasons the State was seeking to terminate her parental rights to B.K. Mother disputed the diagnosis and recommendation, however, believing the psychologist reached this diagnosis and recommendation "without investigating, without finding out if, in fact, I was telling the truth."

¶31 The psychologist who diagnosed Mother's delusional disorder testified the Mother had many positive attributes. The psychologist related that Mother's "intellectual functioning falls in the average range," "she has good thinking and reasoning abilities," and there were "no concerns in terms of intellectual deficits or delays." The psychologist specially noted that Mother is "relatively high functioning [at work]" and "does present as intelligent, interesting, bright and friendly." The psychologist nonetheless concluded Mother "met criteria for a diagnosis of delusional disorder" when the results of testing, case history and her self-reporting were considered.

¶32 According to the psychologist, this disorder is difficult to understand because "on one hand her beliefs [about police harassment] sound so unrealistic and farfetched . . .and yet she goes to jobs, she manages customers and clients very well, [and] interacts with her boss in very positive ways." The psychologist explained that "in this area of delusional beliefs, the individual typically has no insight that those beliefs are not reality based." The psychologist noted that individuals with delusional disorder "can be difficult to convince . . . to get into treatment," but "up to 90 percent of individuals who are willing to take medications that are typically prescribed for this diagnosis show significant improvement."

¶33 One of the risks of delusional disorder going untreated is "problematic behaviors" and "interactions with the external world that are not appropriate based . . . but they're based on that individual's false beliefs." When asked if an individual with a delusional disorder would be able to provide a safe environment for a younger child, the psychologist said she "would have concerns." The psychologist characterized mother's delusion about B.K. being involved with the police as "highly concerning." The psychologist explained that she was concerned Mother might react inappropriately in response to a delusional threat and put B.K. at risk.

¶34 When asked if Mother would be able to provide B.K. what he needs to grow into a healthy adult, if the delusional disorder goes untreated, the psychologist responded she could not answer that question with certainty. The psychologist did indicate that "delusional disorder will not just go away" and specifically noted "research suggests delusional disorder has a fairly stable course, meaning that individuals who do not get treatment for their disorder tend to continue to manifest false beliefs throughout their life."

¶35 This Court's duty on appeal in a termination of parental rights case is to canvass the record to determine whether the evidence is such that a fact finder could reasonably form a firm belief or conviction that the grounds for termination were proven. In re C.D.P.F., 20120 OK 81, ¶ 6, 243 P.3d 21. In doing so, this Court does not re-weigh the evidence. Id.

¶36 A jury who observes the witnesses and hears their testimony first hand is in the best position to judge credibility and determine the appropriate weight to be given such evidence. This advantage is particularly important in a case like this where one of the issues is whether the parent has a delusion or "false belief" of being a target of police intimidation or is truly the victim of police harassment. This advantage is equally important when assessing the capacity of the parent to understand (1) how the parent's beliefs concerning police harassment affect the child, and (2) how the parent's acceptance of treatment benefits the child, even if the parent sincerely believes the parent does not need it.

¶37 Upon review, we hold that the foregoing evidence is of such character and quality that the jury could form a firm belief or conviction that the grounds for termination were proven by clear and convincing evidence. In particular, the foregoing evidence clearly and convincingly demonstrated that Mother had the capacity to understand (1) her beliefs concerning police harassment had been diagnosed as delusional and formed one of the conditions that led to B.K. being adjudicated deprived, (2) accepting treatment in the form of medication was necessary to correct this condition, and would benefit B.K. , even if she sincerely believed she did not need it, and (3) failure to accept treatment to correct this condition would result in termination of her parental rights to B.K. These matters were addressed in Mother's Individualized Service Plan, the Court 's periodic reviews of Mother's progress over thirty-six months and the Petition to Terminate. Because Mother was afforded notice of the "condition" she needed to correct, was provided assistance and services, and given a reasonable period of time in excess of three months to do so, we hold the trial court did not commit fundamental error by allowing the State to seek termination pursuant to 10A O.S.2011, § 1-4-904(B)(5), even though the State could have alternatively proceeded under 10A O.S.2011, § 1-4-904(B)(13). These provisions are not mutually exclusive, but complement one another. Both provide equivalent due process to parents and comparable protections for children.

CERTIORARI PREVIOUSLY GRANTED; OPINION OF THE COURT OF CIVIL
APPEALS VACATED; JUDGMENT ON THE JURY VERDICT AFFIRMED

CONCUR: COMBS, C.J., GURICH, V.C.J., KAUGER, WATT, WINCHESTER,
EDMONDSON, COLBERT, REIF, JJ., and BUETTNER, S.J.

NOT PARTICIPATING: WYRICK, J.

FOOTNOTES

[1] Subsection (B)(13) provides:

"B. The court may terminate the rights of a parent to a child based upon the following legal grounds:

. . .

13. A finding that all of the following exist:

a. the parent has a diagnosed cognitive disorder, an extreme physical incapacity, or a medical condition, including behavioral health, which renders the parent incapable of adequately and appropriately exercising parental rights, duties, and responsibilities within a reasonable time considering the age of the child, and

b. allowing the parent to have custody would cause the child actual harm or harm in the near future.

A parent's refusal or pattern of noncompliance with treatment, therapy, medication, or assistance from outside the home can be used as evidence that the parent is incapable of adequately and appropriately exercising parental rights, duties, and responsibilities.

A finding that a parent has a diagnosed cognitive disorder, an extreme physical incapacity, or a medical condition, including behavioral health or substance dependency, shall not in and of itself deprive the parent of parental rights."

[2] Subsection B(5) provides:

"B. The court may terminate the rights of a parent to a child based upon the following legal grounds:

5. A finding that:

a. the parent has failed to correct the condition which led to the deprived adjudication of the child, and

b. the parent has been given at least three (3) months to correct the condition."

 





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Court of Civil Appeals Cases
 Cite
Name
Level

 2003 OK CIV APP 29, 66 P.3d 1004, IN THE MATTER OF C.R.T.
Discussed
 2012 OK CIV APP 65, 280 P.3d 366, IN THE MATTER OF R.A.
Discussed
Oklahoma Supreme Court Cases
 Cite
Name
Level

 2010 OK 81, 243 P.3d 21, IN THE MATTER OF C.D.P.F.
Cited
 1981 OK 35, 626 P.2d 864, Lyni P., Matter of
Discussed