OSCN Found Document:IN THE MATTER OF V.J.R.

 

 
 

 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only

 
 
 

 
 IN THE MATTER OF V.J.R.
2024 OK 66
Case Number: 120844; Comp. w/120910
Decided: 09/24/2024
THE SUPREME COURT OF THE STATE OF OKLAHOMA

Cite as: 2024 OK 66, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

 

 

In the matter of V.J.R. (a/k/a F.M.), a deprived child:

BRANDI MCCUBBIN, Respondent/Appellant,
v.
THE STATE OF OKLAHOMA, Petitioner/Appellee.

ON APPEAL FROM THE DISTRICT COURT OF OKLAHOMA COUNTY,
STATE OF OKLAHOMA

HONORABLE KAITLYN G. ALLEN, DISTRICT JUDGE

¶0 Respondent/Appellant, Brandi McCubbin (hereinafter "Adoptive Mother"), appeals the trial court's order terminating her parental rights for failure to protect V.J.R., also known as F.V.M. (hereinafter "Child"), from shocking and heinous abuse pursuant to 10A O.S.2021, § 1-4-904(B)(9). This Court retained the appeals in this case and a companion case--i.e., Victoria Rodriguez v. State of Oklahoma (In re M.R.), No. 120,910 (Okla. filed Dec. 7, 2022)--to address an issue of first impression concerning whether the trial court should have applied ICWA's heightened burden of proof in a case that does not involve a Native American child or family. In Rodriguez v. State (In re M.R.), 2024 OK 28, ¶¶ 0, 16--23, 548 P.3d 120, 123, 128--31, we held that, in such a case, the parent lacks standing to challenge the constitutionality of ICWA and that, even if we were to presume standing existed, the equal protection claim must fail because ICWA's heightened burden is based on a preference that is political (i.e., tribal membership) rather than racial. Thus, all that remains in this appeal is to dispose of Adoptive Mother's remaining arguments concerning the sufficiency of the evidence against her and the admission of a DVD recording of Child's forensic interview into evidence. Upon review of those issues, we find that the trial court's order terminating parental rights should be affirmed.

JUDGMENT OF THE DISTRICT COURT AFFIRMED.

Christian Henry, Oklahoma City, Oklahoma, for Respondent/Appellant.

Jaclyn Rivera, OKLAHOMA COUNTY DISTRICT ATTORNEY's OFFICE, Oklahoma City, Oklahoma, for Petitioner/Appellee.

William R. Hauser, OKLAHOMA COUNTY PUBLIC DEFENDER'S OFFICE, Oklahoma City, Oklahoma, for V.J.R. (a/k/a F.V.M.).

COMBS, J.:

I. FACTUAL AND PROCEDURAL BACKGROUND

¶1 Adoptive Mother and her husband of 20 years, Charles Allen McCubbin (hereinafter "Adoptive Father"), legally adopted Child in September of 2021, when Child was approximately four-and-a-half years old. The adoption was the culmination of a temporary guardianship that Adoptive Mother and Adoptive Father had over Child since she was 15 months old, to which Child's biological birth mother (hereinafter "Biological Mother") had consented because she had been "severely injured and in dire financial hardship"[1] and because Biological Mother's aunt was Adoptive Mother's best friend. Under these circumstances, the parties opted for an open adoption, meaning child occasionally had phone calls and in-person visitation with Biological Mother.

¶2 On Thursday, March 17, 2022, Biological Mother picked up Child for a weekend visitation. During the drive to Biological Mother's hometown, Biological Mother asked Child what she had been doing earlier that morning and learned that Child had been playing the "tickle game" with Adoptive Father. When describing the tickling, Child demonstrated that Adoptive Father tickled her neck, under her arms, and in the vaginal area between her legs. Child further stated that she was wearing only her panties at that time, that Adoptive Father had no clothes on, and that such tickling occurred in the bed shared by Adoptive Father and Adoptive Mother while all three of them were lying in bed. Upon arrival in her hometown, Biological Mother drove straight to the police department and reported what Child had just disclosed. The police officers there directed Biological Mother to make a police report in the jurisdiction where the alleged sexual abuse occurred. When Biological Mother reached out to the police department in Child's hometown, they referred her to a hospital where Child could be forensically interviewed.

¶3 Biological Mother took Child to the hospital for a forensic interview the next day. At the hospital, Biological Mother and Child were met by Andrea Frisby, an employee of DHS's Child Protective Services, and Amy Baum, a social worker employed by the hospital who coordinated its Child Protection Team. Ms. Baum received training to interview children about allegations of abuse and neglect and conducted more than 3,000 interviews during her 29-year career at the hospital. She conducted a 39-minute forensic interview of Child that was digitally preserved with an audio-visual recording. During the interview, Child repeated everything she had already told Biological Mother, but she dislcosed some new information as well. Ms. Baum went over anatomical diagrams for boys and girls with Child to find out what Child called various body parts. When Ms. Baum pointed to the genital area on the male diagram and asked Child what to call that part, Child told Ms. Baum that was a "tee-tee." Later, when Ms. Baum asked whether Adoptive Father ever asks Child to do anything to parts of his body, Child responded that she had helped Adoptive Father clean and put cream on his tee-tee and used her hand to indicate that she was grabbing something pole-shaped and moving up and down, back and forth. Child indicated that she had done this "a lot of times," and even drew a picture of the cream's container on her own initiative. Child also used a sigh to demonstrate the noise Adoptive Father made when she put cream on his tee-tee. A medical doctor and Ms. Frisby watched the interview live from another room. Afterwards, Ms. Baum, Ms. Frisby, and the physician decided to involve the police.

¶4 Later that day, Detective Abigail McCavitt with the Crimes Against Children Unit met with Ms. Frisby, Ms. Baum, and the physician at the hospital. They decided to take Child into protective police custody rather than DHS custody, because it remained unknown whether Adoptive Mother knew about the alleged sexual abuse or whether she would take steps to protect Child from further abuse. Detective McCavitt opened up a criminal investigation of Adoptive Father and Adoptive Mother. Detective McCavitt spoke with Biological Mother at the hospital and reviewed the recording of Child's forensic interview. Later that day, Detective McCavitt and Ms. Frisby met with Adoptive Father and Adoptive Mother at their residence to inform them of the accusations, to set up an interview at the police station for the following Monday, and to schedule a Child Safety Meeting (CSM) with DHS for the following Tuesday.

¶5 In the meantime, Ms. Frisby reviewed Child's welfare history and the criminal histories for Adoptive Father and Adoptive Mother. She learned of a previous DHS referral from 2019 where Adoptive Father had been accused of sexually abusing another little girl in Oklahoma for whom Adoptive Mother was the nanny. Attached to that referral was a second referral to DHS concerning a threat of harm to Child based on his alleged sexual abuse of the other little girl. DHS had screened out these referrals as unsubstantiated because, although the little girl had told her parents that Adoptive Father made her touch his penis, she failed to disclose anything in her forensic interview. Ms. Frisby also found a prior referral from Texas made in 2018 concerning accusations that back in 2014 Adoptive Father showed pornography to a little girl and masturbated in front of her. DHS would later learn that Adoptive Mother had been the nanny for this child in Texas. But this referral was also screened out as unsubstantiated because no criminal charges were filed against Adoptive Father and DHS had no jurisdiction in Texas to investigate the allegations further. Nevertheless, both Ms. Frisby and Detective McCavitt believed the unsubstantiated referrals indicated a pattern of conduct for Adoptive Father.

¶6 On Monday, March 21, 2022, Detective McCavitt interviewed Adoptive Mother first. During the interview, Adoptive Mother disclosed that she was aware of the 2019 accusations against Adoptive Father, but she remembered the DHS social worker saying that kids construe things differently and that he didn't see where anything wrong had happened. After the incident, she and the family that employed her agreed that Charles would no longer come around the children Adoptive Mother was nannying. When asked about the accusations from Texas, Adoptive Mother claimed no awareness. Adoptive Mother told Detective McCavitt that she's never seen Adoptive Father do anything inappropriate or anything that would cause concern. Adoptive Mother generally provided information about sleeping arrangements and about times when Child had been left alone with Adoptive Father. She stated that everyone was wearing pajamas when Child slept in bed with her and her husband. When asked about the tickling game, Adoptive Mother told Detective McCavitt that both she and Adoptive Father usually tickle Child before bedtime on her "pitties" (her term for armpits), "hockies" (her term for thighs derived from ham hocks), "riblets" (her term for ribs), and neck--all terms that, incidentally, did not match the terms Child used for labeling the parts of her body during the forensic interview. Detective McCavitt also asked Adoptive Mother whether she has had conversations with Child about inappropriate touching. Adoptive Mother said that she had told Child not to let anyone touch her "vagina" and not touch anyone else's "vagina" or "penis," and she affirmed that she had used the anatomically correct terms of "vagina" and "penis" with Child. She said that she never used any other terminology with Child for those body parts and claimed that Child had never referenced those body parts except once, when Child said their cat had jumped on her "balls." But again, Child had used none of those terms when labeling parts of the body during the forensic interview. When asked about the term "tee-tee," Adoptive Mother recalled that Biological Mother used that term with Child. Adoptive Mother told Detective McCavitt that Adoptive Father had a medical condition that's prevented him from having an erection for over 2 years and disclosed that she had not been sexually intimate with Adoptive Father during that time period. She was not aware of Adoptive Father seeking sexual satisfaction from anyone else. Although she did not believe her husband was capable of sexually assaulting their daughter, Adoptive Mother acknowledged that there was a pattern of conduct. Nevertheless, Adoptive Mother remained adamant that she knew nothing about any alleged sexual abuse and that she would have taken action if she had any inclination something was amiss.

¶7 Immediately after Adoptive Mother's interview, Detective McCavitt interviewed Adoptive Father. Adoptive Father insisted that Child had been coached by Biological Mother, but he acknowledged that Child hadn't been alone with Biological Mother since December of 2021. Adoptive Father admitted that he directed Child to help him clean an area around his thigh and groin where he had jock itch. He also stated that he needed Child's help holding up his fat while he applied the medication. But he insisted that nothing inappropriate happened and that there was no way Child saw anything or was able to do the hand motion she demonstrated during the forensic interview because he has an inverted penis and erectile dysfunction (ED). Nevertheless, Adoptive Father admitted he hadn't seen a doctor in over two years and that he had never been formally diagnosed with ED. Adoptive Father also signed a search waiver and allowed the police department to photograph his groin area, at which point he also demonstrated to Detective McCavitt's satisfaction the need for a third hand to clean the area and apply the medicated cream. Of more consequence for Adoptive Mother, however, was his revelation that Adoptive Mother confronted him about this incident after Child told her about it. When Adoptive Mother confronted Adoptive Father, she told him that Child claimed to have helped him clean the jock itch area earlier that day and that Child had used the same hand motion she made during the forensic interview. So Adoptive Mother wanted Adoptive Father to explain why he would have Child do that. Detective McCavitt was surprised that Adoptive Mother had forgotten to mention during her interview this confrontation that occurred only weeks earlier, but she never got to ask Adoptive Mother about the confrontation because Adoptive Mother was ready to leave when Adoptive Father's interview ended.

¶8 On Tuesday, March 22, 2022, Ms. Frisby conducted the CSM with Adoptive Mother and Adoptive Father. They discussed multiple times how Adoptive Mother and Adoptive Father had instructed Child about what touches were okay and not okay and about coming to tell them when something made her uncomfortable. They also discussed how the incident with Adoptive Father made Child uncomfortable and led her to tell Adoptive Mother about the incident. Adoptive Mother never really answered how her confrontation of Adoptive Father slipped her mind during the police interview, but Ms. Frisby perceived that Adoptive Mother had simply taken Adoptive Father at his word, decided it was no big deal, and had moved on. Adoptive Mother indicated that the confrontation had happened approximately four weeks earlier, giving her ample opportunity to take actions to protect Child from the risk of subsequent abuse. When asked about the 2019 accusations against Adoptive Father, Adoptive Mother seemed dismissive and said that she quit bringing the kids she nannied around Adoptive Father per their family's wishes. Adoptive Mother mostly blamed Biological Mother for the investigation, claiming Biological Mother must have coached Child. The CSM left Ms. Frisby dissatisfied with Adoptive Mother's level of protective capacities. Consequently, it was decided that Child should be taken into DHS custody.

¶9 The State filed an application to take Child into emergency custody on Wednesday, March 23, 2022. The trial court held an initial emergency custody hearing that Friday, March 25th. The court made certain findings, but ultimately continued the hearing to Monday, March 28th. Under the "Reasonable Efforts" section of the court's initial order, the trial court determined that Child's continuation in the home was contrary to her health, safety, or welfare due to "allegations of lack of proper parental care/guardianship, threat of harm, failure to protect, and sexual abuse."[2] The court also determined that "the Indian Child Welfare Act does not apply" to Child.[3] Although emergency custody was not officially ordered due to the continuance, the court acknowledged Child had been placed in a kinship home. At the follow-up hearing, Adoptive Mother and Adoptive Father waived their rights to an emergency custody hearing, and the court entered an emergency custody order that Child "remain in DHS custody."[4]

¶10 The State filed its petition on April 1, 2022, wherein it sought to adjudicate Child deprived and to terminate parental rights as to both Adoptive Mother and Adoptive Father "pursuant to 10A O.S. § 1-4-904(B)(9) for shocking and heinous abuse or failure to protect from shocking and heinous abuse."[5] Because of the "heinous and shocking" nature of the allegations against them, DHS did not offer an Individualized Service Plan (ISP) to reunify Child with Adoptive Mother and Adoptive Father.[6] Child's permanency worker at DHS, Briann Wood, determined that reunification with Adoptive Mother would be inappropriate because she perceived that Adoptive Mother didn't believe Child and because Adoptive Mother continued to stay with Adoptive Father.[7] DHS ultimately tried two different kinship placements before placing Child in a foster home in mid-July of 2022.

¶11 An initial appearance was held April 18th, at which point the trial court scheduled the adjudication hearing for May 19th. In the intervening month, however, Biological Mother sought to intervene and to vacate her consent to the adoption based on fraud. When May 19th arrived, rather than holding an adjudication hearing, the court scheduled a hearing on Biological Mother's motions for June 29th and a jury trial for termination of parental rights on August 29th.

¶12 As the trial date approached, the State filed (1) a Notice of Intent to Use Child Hearsay Statements in compliance with 12 O.S.2021, § 2803.1; (2) a Motion to Allow Child Witness to Testify by Alternative Method pursuant to 10A O.S.2021, § 1-4-506(B); (3) subpoenas requiring several people, including Child, to appear and testify at trial; and (4) a Motion to Limit the Examination of Child Witness to Age Appropriate Language, Grammar, and Sentence Structure. The Notice expressed the State's desire to utilize--among other things--Child's recorded forensic interview at trial and requested a "determin[ation] at a hearing outside the present [sic] of the jury that the above-referenced statements may be admitted into evidence pursuant to 10A O.S.[2021, §] 1-4-505(B)(1) and 12 O.S.[2021,] § 2803.1(B)."[8] The other three filings indicated that the State wanted Child available for testimony should the need arise, but wanted procedural accommodations to be made if Child's testimony became necessary.[9]

¶13 A pretrial conference was held August 19, 2022. After addressing some visitation issues, the assistant district attorney announced she had completed discovery with Adoptive Mother and that discovery with Adoptive Father would be completed soon. Counsel for Adoptive Father and the Child's attorney announced their readiness for trial. Counsel for Adoptive Mother announced his readiness, although he had a scheduling conflict with a hearing in another case that he needed to resolve. The trial court announced that it would hear the State's motions first thing on the trial date. At that point, counsel for Adoptive Father announced that "he would be prepared to accept hearsay statements from the child, rather than have the child be present in the courtroom."[10] Counsel for Adoptive Mother similarly stated that he "[wa]s content for the child not to be present and accept hearsay statements."[11]

¶14 On August 29th, Adoptive Father failed to appear, which the trial court found to constitute consent to the termination of his parental rights over Child pursuant to 10A O.S.2021, § 10-4-905(A)(5).[12] Before potential jurors appeared, the parties announced stipulations regarding the State's motions to use Child's hearsay statements, to obtain Child's testimony by alternative methods, and to use age-appropriate language:

THE COURT: . . . Ms. Daly, do you have an announcement to these three motions?

MS. DALY: Your Honor, based on conversations with Mr. Macarthy, it's my understanding that he will stipulate to the Child Hearsay Motion as to the admissibility of those statements under the Child Hearsay Statutes. I'm not aware of any objection to the other two motions.

THE COURT: Thank you, very much. Mr. Macarthy?

MR. MACARTHY: And, Your Honor, that is correct. We will stipulate to the admissibility, and there are no objections to the other motions.

THE COURT: Okay. Then I will ensure that if the child is called to testify, we will determine alternative means, whether the easiest be that she appear in the jury room or in some other location for virtual. I will remain in the courtroom with the jurors, and the attorneys will be present in the courtroom -- or sorry, in the location of the child, along with any other support person necessary for the child as far as CASA goes.

MS. DALY: Thank you, Judge.

THE COURT: So any objection to any of that?

MR. MACARTHY: No objection, Your Honor.[13]

Thereafter, a venire of potential jurors arrived and the voir dire process began. After lunch but before the selection of a jury panel, Adoptive Mother's attorney announced that she wished to waive her right to a jury trial.

¶15 A bench trial commenced that afternoon, lasting three days. The State presented testimony from Ms. Frisby, the DHS social worker; from Ms. Baum, the hospital's social worker; from Detective McCavitt; from Child's foster mother; from Ms. Wood, the DHS permanency worker; and from Child's therapist, Brandy Guidry. The State also introduced a video recording of Child's forensic interview with Ms. Baum, a video recording of Adoptive Mother's interview with Detective McCavitt, and the police department's photographs of Adoptive Father's groin as exhibits in evidence. At the close of the State's case-in-chief Adoptive Mother's attorney demurred to the State's evidence, asking for a directed verdict, which the trial court denied. After a break, Adoptive Mother's counsel announced he would not be calling any witnesses and rested. At that stage, the trial court "f[ou]nd[] that based on the preponderance of the evidence having heard the testimony presented that the State met their burden to adjudicate V[.]J[.]R[.], also known as F[.]M[.], as deprived and made a ward of this Court . . . ."[14] The trial court then heard closing arguments and took the matter under advisement.

¶16 At a hearing held October 6, 2022, the trial court announced it would be terminating Adoptive Mother's parental rights. An Order Terminating Parental Rights was filed on October 11th, finding by clear and convincing evidence that Adoptive Mother failed to protect Child from shocking and heinous abuse and that termination of parental rights was in Child's best interest.[15] It is from this order that Adoptive Mother now appeals.

II. STANDARD OF REVIEW

¶17 This Court has "repeatedly recognized that the right of a parent to the care, custody, companionship and management of his or her child is a fundamental right protected by the federal and state constitutions." In re Adoption of Darren Todd H., 1980 OK 119, ¶ 18, 615 P.2d 287, 29; accord Staton v. Shuler (In re Adoption of L.D.S.), 2006 OK 80, ¶ 11, 155 P.3d 1, 4; State v. Walker (In re A.M.), 2000 OK 82, ¶ 8, 13 P.3d 484, 487. "The fundamental nature of parental rights 'requires that the full panoply of procedural safeguards must be applied' before a parent may be deprived of that right." In re Adoption of Darren Todd H., 1980 OK 119, ¶ 18, 615 P.2d at 290 (quoting In re Chad. S., 1978 OK 94, ¶ 12, 580 P.2d 983, 985).

¶18 In keeping with that philosophy, this Court held in the cases of In re Adoption of Darren Todd H., 1980 OK 119, 615 P.2d 287, and In re C.G., 1981 OK 131, 637 P.2d 66, that the petitioner seeking to sever someone's parental rights--be it the State or some prospective adoptive parent--bears the burden of proving their allegations by clear and convincing evidence. 1981 OK 131, ¶ 17, 637 P.2d at 66; 1980 OK 119, ¶ 18, 615 P.2d at 290. Shortly thereafter, "the United States Supreme Court, in Santosky v. Kramer, [455 U.S. 745 (1982),] pronounced its constitutional command that before a state may sever the rights of parents in their natural child, the state must support its allegations at trial by at least clear-and-convincing evidence." Widick v. State (In re S.B.C.), 2002 OK 83, ¶ 5, 64 P.3d 1080, 1081. Our case law provides that clear and convincing evidence is the measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established. Daniels v. State (In re C.D.P.F.), 2010 OK 81, ¶ 5, 243 P.3d 21, 23 (citing Staton, 2006 OK 80, ¶ 11, 155 P.3d at 4; In re C.G., 1981 OK 131, ¶ 17 n.12, 637 P.2d at 71 n.12). It is this standard of proof that "balances the parents' fundamental freedom from family disruption with the state's duty to protect children within its borders." Staton, 2006 OK 80, ¶ 11, 155 P.3d at 4 (quoting In re C.G., 1981 OK 131, ¶ 17, 637 P.2d at 70).

¶19 Likewise, in the appeal of an order terminating parental rights, this Court will only affirm the trial court's factual determinations if they are supported by clear and convincing evidence. Daniels, 2010 OK 81, ¶ 6, 243 P.3d at 24 (citing Widick, 2002 OK 83, ¶ 7, 64 P.3d at 1082). This does not mean, however, that we reweigh the evidence presented at trial. Alfred v. State (In re L.M.A.), 2020 OK 63, ¶ 38, 466 P.3d 559, 569; Williams v. State, (In re B.K.), 2017 OK 58, ¶ 35, 398 P.3d 323, 330; Daniels, 2010 OK 81, ¶ 6, 243 P.3d at 24. Rather, "[w]e must canvass the record to determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven." Daniels, 2010 OK 81, ¶ 6, 243 P.3d at 24 (citing Widick, 2002 OK 83, ¶ 6, 64 P.3d at 1081).

¶20 On the other hand, in reviewing an appellant's claim that the trial court incorrectly decided a question of law like statutory construction, this Court reviews the legal issue de novo. In re Adoption of Baby Boy A, 2010 OK 39, ¶ 20, 236 P.3d 116, 122; Starks v. State (In re Unborn Child of Starks), 2001 OK 6, ¶ 12, 18 P.3d 342, 345. Similarly, this Court reviews de novo an appellant's claim that the procedure used in a termination hearing resulted in denial of a constitutional right, such as due process or equal protection. Walker, 2000 OK 82, ¶ 6, 13 P.3d at 486--87. Under the de novo standard, this Court examines legal issues independently, without deference to the trial court's findings. See id., 13 P.3d at 487 (citing Neil Acquisition, L.L.C. v. Wingrod Inv. Corp., 1996 OK 125, ¶ 5 n.1, 932 P.2d 1100, 1103 n.1).

¶21 Lastly, when the record on appeal demonstrates that the appellant failed to object properly to the admission of evidence at trial and has thereby failed to preserve an alleged error on appeal, the appellant must make a showing of plain error resulting in prejudice or of fundamental error (in which case the prejudice is inherent or presumed). See Dougherty v. State (In re J.L.O., IV), 2018 OK 77, ¶ 25, 428 P.3d 881, 889; Duke v. Duke, 2020 OK 6, ¶ 27, 457 P.3d 1073, 1082. An appellant demonstrates prejudice by showing that "the verdict would have been different had the alleged error not occurred as measured by the usual criterion of the verdict's support in the evidence." Karriman v. Orthopedic Clinic, 1973 OK 141, ¶ 21, 516 P.2d 534, 540 (citation omitted) (citing Teague v. United Truck Serv., 1972 OK 97, ¶14, 499 P.2d 380, 383--84; Sisler ex rel. Estate of Sisler v. Jackson, 1969 OK 104, ¶ 0, 460 P.2d 903, 904; Hutton v. Lowry, 1968 OK 114, 444 P.2d 812; Mo.-Kan.-Tex. R.R. v. Jones, 1960 OK 40, ¶ 0, 354 P.2d 415, 416; Okla. Transp. Co. v. Phillips, 1953 OK 381, ¶ 0, 265 P.2d 467, 467). "Fundamental error is error that compromises the integrity of the proceeding to such a degree that the error has a substantial effect on the rights of one or more of the parties," thereby resulting in a "clear miscarriage of justice." Covel v. Rodriguez, 2012 OK 5, ¶ 10, 272 P.3d 705, 710 (citing Sullivan v. Forty-Second West Corp., 1998 OK 48, ¶ 7, 961 P.2d 801, 803); In re Estate of Speers, 2008 OK 16, ¶ 15 n.21, 179 P.3d 1265, 1271 n.21 ("'In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings.' The doctrine of plain error is rarely applied in civil cases and usually reserved to prevent a clear miscarriage of justice." (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936))); see also Jones, 2015 OK 36, ¶ 17, 373 P.3d at 1029. For instance, fundamental error can occur when the trial court fails to accurately state the law and thereby compromises the integrity of the proceeding to such a degree that the error has a substantial effect on the rights of a party. Rodriguez v. State (In re M.R.), 2024 OK 28, ¶ 8, 548 P.3d 120, 125--26 (citing Farris v. Masquelier, 2022 OK 91, ¶ 14, 524 P.3d 942, 948). Typically, however, fundamental errors involve such egregious missteps as:

(1) failure to provide the assistance of counsel, In re Chad S., 1978 OK 94, ¶¶ 14--15, 580 P.2d 983, 986; Michael F. v. State ex rel. Dep't of Human Servs. (In re D.D.F.), 1990 OK 89, ¶ 13, 801 P.2d 703, 706; Robinson v. State, 2011 OK CR 15, ¶ 3, 255 P.3d 425, 428; Gideon v. Wainwright, 372 U.S. 335 (1963);

(2) failure of a trial judge to disqualify where actual bias or the appearance of partiality exists, Pierce v. Pierce, 2001 OK 97, ¶¶ 19--20, 39 P.3d 791, 799; Robinson, 2011 OK CR 15, ¶ 3, 255 P.3d at 428; Tumey v. Ohio, 273 U.S. 510 (1927);

(3) allowing a jury to see a defendant in shackles, In re Mental Health of L.B., 1982 OK 47, ¶¶ 6--7, 645 P.2d 498, 500; Davis v. State, 1985 OK CR 140, ¶¶ 3--6, 709 P.2d 207, 208--09; Deck v. Missouri, 544, U.S. 622, 627--28 (2005); and

(4) allowing improper comment upon a defendant's decision to invoke the right against self-incrimination, Dungan v. State, 1982 OK CR 152, ¶¶ 6--7, 651 P.2d 1064, 1065--66; Griffin v. California, 380 U.S. 609, 611--15 (1965); cf. Sabouri v. Hunter, 1979 OK 95, ¶¶ 5, 7, 596 P.2d 891, 892--93 (wherein this Court--in a civil tort action for conversion of $900,000 that two corporate entities filed against a former employee--issued a writ of prohibition to prevent the trial court's enforcement of discovery sanctions against employee based on his invocation of the right against self-incrimination as the basis for refusing to answer the plaintiffs' discovery).

If fundamental error has occurred, this Court will presume prejudice to the appellant and will reverse the trial court, unless the appellee can demonstrate "affirmatively . . . from the record that no harm resulted therefrom." Roberts v. Lewis, 1968 OK 38, ¶ 19, 441 P.2d 350, 355; accord Simpson v. State, 1994 OK CR 40, ¶ 34, 876 P.2d 690, 701; Fahy v. Connecticut, 375 U.S. 85, 86--87 (1963); Chapman v. California, 386 U.S. 18, 24 (1967).

III. ANALYSIS

A. The Trial Court Did Not Err in Failing to Apply 
ICWA's Heightened Burden of Proof. 

¶22 For her first argument, Adoptive Mother claims that ICWA denies her equal protection under the law in violation of the Fourteenth Amendment to the U.S. Constitution and of Article II, Section 7 of the Oklahoma Constitution. Appellant's Br. 2--3 & n.9. Based on the appellate record, there is no evidence that anyone involved in this case is Native American--not Child, not her biological parents, nor her adoptive parents. Adoptive Mother is not arguing here that the trial court erred in finding that ICWA did not apply. See generally supra note 3 and accompanying text. Instead, she is claiming that the trial court committed legal error by not disregarding Child's status and by not applying ICWA's heightened burden of proof anyway, all in violation of Adoptive Mother's equal protection rights.

¶23 There is a difference in the burdens of proof applicable to Native children and non-Native children. On one hand, Oklahoma law generally places the burden on the State to prove by clear and convincing evidence that the statutory basis for terminating parental rights exists and that the child's best interests are served by terminating parental rights. See Daniels v. State (In re C.D.F.P.), 2010 OK 81, ¶ 5, 243 P.3d 21, 23; In re C.G., 1981 OK 131, ¶ 17, 637 P.2d 66, 71; OUJI-Juv. No. 2.5. But as Adoptive Mother points out, § 1912(f) of ICWA mandates that "[n]o termination of parental rights may be ordered in such [involuntary child custody] proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the custody of the [Indian] child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Appellant's Br. 2--3 (quoting 25 U.S.C. § 1912(f) (2018)). Thus, Adoptive Mother argues that "the law provides for additional protections for Indian children" that it does not provide for "other similarly situated children." Id. at 3.

¶24 As a solution, Adoptive Mother proffers "not that ICWA should be held unconstitutional in and of itself, but that all families similarly situated should be entitled to the same protections as any other family, Native American or otherwise." Id. at 4. In other words, she asks that we reverse the trial court's judgment terminating her parental rights insofar as the trial court failed to apply the heightened burden of proof. Insofar as the Oklahoma Court of Civil Appeals (COCA) has previously rejected such an argument in the case of Knight v. State (In re M.K. & L.K.), 1998 OK CIV APP 118, 964 P.2d 241, Adoptive Mother argues that we should find Knight unpersuasive because COCA opinions are nonprecedential and because COCA was too focused on protecting Native American families and failed to consider the effect ICWA has on non-Indian families. Appellant's Br. 3--4.

¶25 Adoptive Mother did not previously raise these arguments below. We need not determine whether Adoptive Mother's alleged error has been preserved for this Court's appellate cognizance, however, because we find that the trial court did not commit error in failing to apply ICWA's heightened burden of proof. Earlier this year in the case of Rodriguez v. State (In re M.R.), 2024 OK 28, ¶¶ 0, 16--23, 548 P.3d 120, 123, 128--31, we already rejected identical arguments.[16] There we held that the parent in a case not involving a Native American child or family lacks standing to challenge the constitutionality of ICWA and, further, that the equal protection claim must fail because ICWA's heightened burden is based on a preference that is political (i.e., tribal membership) rather than racial. We now reaffirm our holdings in Rodriguez, and we affirm the trial court on both its determination that ICWA does not apply and its application of Oklahoma's clear-and-convincing-evidence burden of proof.

B. The Trial Court Did Not Err in Finding Clear and Convincing Proof
of Failure to Report Shocking and Heinous Abuse. 

¶26 For her second argument, Adoptive Mother contends that the State did not meet its burden of proof by clear and convincing evidence. Appellant's Br. 4--6. She argues that she "was villainized for her lack of knowledge concerning inappropriate behavior of her husband and daughter. . . . [W]hile Appellant Mother's protective capacity was questioned[,] no definitive proof was offered to substantiate her complicity in harm to her child." Id. at 5. Adoptive Mother further contends that the State should not have been allowed to bolster their case and thereby meet a clear-and-convincing burden of proof using the testimony of the DHS social worker, Ms. Frisby, about prior "unfounded accusations, inconclusive investigations and unsubstantiated allegations" against Adoptive Father. Id. at 5--6 (citing ROA p.000306, Trial Tr. 26:14--:24, Aug. 29, 2022). Adoptive Mother argues such testimony was hearsay that was more prejudicial than probative and, referencing a criminal case that governs the inclusion or admission of prior similar bad acts (i.e., Burks v. State, 1979 OK CR 10, 594 P.2d 771), that such testimony "would not meet a Burks test" because the allegations "did not even rise to the level of a criminal charge"--which would still be inadmissible--let alone "proven crimes by any standard of proof." Appellant's Br. 5--6. Instead, Adoptive Mother asserts she "was lulled into complacency based on lack of prior evidence or state intervention and proven inconclusiveness" regarding the prior accusations. Id. at 6.

¶27 In response, Appellees[17] set forth the elements of proof for termination of parental rights based on failure to protect a child from heinous and shocking abuse and then proceed to explain how each element was met through the testimony presented at trial. Appellees' Br. 6--10. They claim that Adoptive Mother's "knowledge both of the sexual abuse at issue and at least one former accusation of sexual abuse pertaining to [Adoptive] Father" clearly and convincingly demonstrated that she did possess, or at least reasonably should have possessed, "knowledge of abuse sufficient to trigger a need to protect the [C]hild" and that she "had substantial knowledge regarding abuse of the [C]hild and risk of future abuse." Id. at 7--8. They argue that Adoptive Mother's "belief that at least one other child had accused [Adoptive] Father of sexual abuse" demonstrated that Adoptive Mother "was aware not only of the abuse to the child but also of a pattern of inappropriate behavior," as she admitted to Detective McCavitt. Id. at 8, 10 (citing ROA p.000306, Trial Tr. 32, Aug. 30, 2022).

¶28 Regarding Adoptive Mother's contention about hearsay, Appellees counter that "testimony by witnesses regarding the prior allegations was not hearsay because the statements were not offered for the truth of the matter asserted," invoking section 2801(A)(3) of the Oklahoma Evidence Code. Id. at 11 & n.50 (citing "12 O.S. § 12-2801 [sic]"). They assert the testimony was not offered to demonstrate the truth of such accusations, "but rather to demonstrate [Adoptive] Mother's state of mind when the [C]hild disclosed [Adoptive] Father's sexual abuse." Id. It did not matter "[w]hether or not any child actually made allegations, and whether or not the alleged conduct occurred." Id. Testimony about the prior accusations was only introduced to demonstrate that "[Adoptive] Mother was aware that at least one [other] child had accused [Adoptive] Father of sexual abuse." Id. Having established that knowledge or state of mind, Appellees were able to argue Adoptive Mother had good "cause . . . to take a similar allegation [from Child] even more seriously and [to] act proactively," but she nevertheless failed to protect Child. Id. Furthermore, Appellees argue that "a hearsay exception [sic] applies to the extent that witnesses testified about [Adoptive] Mother's statements regarding her belief or knowledge about the prior allegations," pointing this Court to the hearsay exclusion in section 2801(B)(2)(a) of the Oklahoma Evidence Code for admissions made by a party-opponent. Id. at 11--12 & n.53 (emphasis added) (citing 12 O.S.2021, § 2801).

¶29 Concerning Adoptive Mother's argument about the Burks test, Appellees respond that "the Burks test is inapplicable since this proceeding is civil in nature"--as opposed to criminal--"and concerns the termination of [Adoptive] Mother's rights, not the [Adoptive] Father's." Id. at 12. Moreover, Appellees reiterate that they were not attempting to prove "the truth of the matter asserted," meaning they weren't presenting testimony about the prior accusations to prove that Adoptive Father actually committed those prior acts or to prove that he's a habitual sexual offender who likely reoffended against Child; instead, they offered such testimony to prove "[Adoptive] Mother had knowledge sufficient to trigger protective action." Id. "The effects of the allegations on [Adoptive] Mother's thoughts and state of mind--not the truth of the allegations, subsequent investigations, or charges or lack thereof--was central to showing by clear and convincing evidence that [Adoptive] Mother failed to protect the [C]hild from abuse." Id. at 12--13 (emphasis added). Lastly, Appellees point out that the most detailed account about the prior accusations was elicited by Adoptive Mother's counsel during his cross-examination of Ms. Frisby,[18] thereby implying that Adoptive Mother should be estopped from raising any arguments on the admissibility of statements about the prior accusations for reasons of hearsay or the Burks test. Id. at 13 (citing ROA p.000306, Trial Tr. 59--60, Aug. 29, 2022).

¶30 To terminate Adoptive Mother's parental rights for failure to protect Child from heinous and shocking abuse, the State was required to prove:

1. that the child has been adjudicated deprived;

2. that the parent knew or reasonably should have known of abuse to a child;

3. that the abuse was heinous and shocking;

4. that the parent failed to protect a child from heinous and shocking abuse; and

5. that termination of parental rights is in the best interests of the child.

See 10A O.S.2021, § 1-4-904(A)(1)--(2), (B)(9)[19]; see also OUJI-Juv. No. 3.15 (2022 Supp.).[20] Oklahoma law defines "abuse" as "harm or threatened harm to the health, safety, or welfare of a child by a person responsible for the child's health, safety, or welfare, including but not limited to . . . sexual abuse," which "includes but is not limited to rape, incest and lewd or indecent acts or proposals made to a child, as defined by law." 10A O.S.2021, § 1-1-105(2); see also OUJI-Juv. No. 3.10 (2011). For a definition of "[l]ewd or indecent proposals or acts to child under 16," the Penal Code gives a long list that includes "forc[ing] or requir[ing] a child to touch or feel the body or private parts of . . . another person" "[i]n a lewd or lascivious manner and for the purpose of sexual gratification." 21 O.S.2021, § 1123(A)(5)(f). Oklahoma law considers sexual abuse to be a "serious bodily injury" that serves as one basis for characterizing abuse as "heinous and shocking." See 10A O.S.2021, § 1-1-105(35); OUJI-Juv. No. 3.11 (Supp. 2022). Finally, "failure to protect" is defined as "failure to take reasonable action to remedy or prevent child abuse . . . , and includes the conduct of a nonabusing parent or guardian who knows the identity of the abuser . . . but lies, conceals or fails to report the child abuse . . . or otherwise take reasonable action to end the abuse." 10A O.S.2021, § 1-1-105(26); see also OUJI-Juv. No. 3.19A (Supp. 2022).

¶31 Adoptive Mother's arguments seem to coalesce around the second and fourth elements, as she seems to question whether the State proved that she knew or reasonably should have known that Adoptive Father sexually abused Child and whether the State proved that she failed to take reasonable action to remedy the abuse or to prevent future abuse. No one appears to dispute that Child was adjudicated deprived, that abuse occurred, or that such abuse would be characterized as heinous and shocking. Although Adoptive Mother clearly disputes whether her parental rights should be terminated, she's not making any arguments that specifically address Child's best interests.

¶32 Upon review of the evidence presented in the record on appeal, we find that the trial judge as factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. The clear and convincing proof for each element of failure to protect a child from heinous and shocking abuse is set forth below.

¶ 33 With regard to the first element, Child was adjudicated as deprived with respect to Adoptive Mother during the termination proceeding after all parties rested on the third day of the bench trial:

THE COURT: Okay. Seeing that Mr. Macarthy has rested and that both the State and Mr. Hauser have rested, does the State renew their request on adjudication?

MS. DALY: Yes, Judge.

THE COURT: Okay. The Court finds that based on the preponderance of the evidence having heard the testimony presented that the State met their burden to adjudicate [Child] as deprived and made a ward of this Court based on lack of proper parental care and guardianship . . . .[21]

This is the only element that the State can prove by a preponderance of the evidence. See Rodriguez, 2024 OK 28, ¶ 8, 548 P.3d at 125 (citing Alfred, 2020 OK 63, ¶ 37, 466 P.3d at 569); In re J.B., 1982 OK 40, ¶¶ 6--7, 643 P.2d 306, 308--09 (seminal case in which this Court rejected extension of the clear-and-convincing burden of proof to the adjudicatory stages of dependency actions).

¶34 Regarding the occurrence of abuse that is heinous and shocking as required by the second and third elements, there is ample evidence that Adoptive Father sexually abused Child insofar as he committed lewd or indecent acts by requiring her to touch his penis for sexual gratification. Child's disclosure of the sexual abuse incident appears to be truthful--particularly insofar as Child demonstrated knowledge of sexual things of which no 5-year-old should be aware, such as her hand motion and her demonstration of Adoptive Father's sigh when she finished putting cream on his "tee-tee." Child's disclosures in the forensic interview were corroborated by Detective McCavitt's testimony that Adoptive Father described a confrontation between himself and Adoptive Mother four to six weeks earlier where Adoptive Mother used the same hand motion--as if Child had also shown her that hand motion--thereby demonstrating consistency over time in Child's disclosures to different people. Moreover, the DHS social worker and the highly qualified forensic interviewer both testified that they found Child's disclosures to be credible. Adoptive Father's excuses about having an inverted penis and undiagnosed erectile dysfunction are not credible. He doesn't have ED just because he told Adoptive Mother that he has it, and no evidence was presented concerning whether his penis remains inverted when erect. Thus, the State's uncontroverted evidence leaves a firm belief or conviction that heinous and shocking sexual abuse did occur.

¶35 Concerning the remainder of the second element about Adoptive Mother's knowledge, the State convincingly proved at the very least that Adoptive Mother had constructive knowledge of Adoptive Father's lewd and indecent act with Child, if not actual knowledge. The testimony of the DHS social worker and Detective McCavitt demonstrated that Child had informed Adoptive Mother about touching Adoptive Father's penis, all of which led to the confrontation between Adoptive Mother and Adoptive Father discussed above. Even if that cannot be deemed actual knowledge of abuse because Adoptive Mother didn't witness the act itself, the State's evidence concerning prior accusations clearly and convincingly proved constructive knowledge. Ms. Frisby and Detective McCavitt's testimony and the audio-visual recording of Adoptive Mother's police interview demonstrated that Adoptive Mother knew of at least one prior accusation involving sexual abuse against Adoptive Father and insinuated that she might even know about both prior accusations insofar as she remained friends with the mother of the second accuser. Any person using reasonable care or diligence should have known that sexual abuse occurred based on Child's allegations of sexual abuse at the hands of a man whose history involved prior--albeit unsubstantiated--accusations of sexual abuse.

¶36 Adoptive Mother injects new objections regarding testimony about the prior accusations, but she has failed to demonstrate error, let alone prejudice. We agree with the State that testimony about what these accusers said was not hearsay because the statements weren't being offered to prove the truth of the matter asserted--i.e., they weren't being offered to prove that Adoptive Father had sexually abused the accusers. Moreover, we agree with the State that the Burks test does not come to bear because the accusers' testimony was not being presented to prove that Adoptive Father actually committed those prior acts or to prove that he's a habitual sexual offender who likely reoffended against Child. Instead, such testimony was being offered to prove that Adoptive Mother had notice of prior allegations against her husband. Furthermore, as the State contends, testimony about Adoptive Mother's statements showing awareness of at least one prior accusation was not hearsay as Adoptive Mother's statements are an adverse admission by a party opponent. Whether the accusations of prior sexual abuse are true and whether Adoptive Mother believed such accusations is immaterial. Any reasonable person in Adoptive Mother's position with knowledge of prior accusations against her husband should have and would have taken Child's accusations of sexual abuse more seriously. This all goes to show that the State was using such testimony as direct evidence of Adoptive Mother's knowledge of abuse, not merely to villainize her. To the extent Adoptive Mother wants to argue now that all this evidence should have also been excluded "because its probative value was far exceeded by the consequential prejudicial effect" despite her trial attorney's failure to lodge any objection, see Appellant's Br. 6, she has failed to demonstrate a clear abuse of discretion. Even when such error has been preserved for our review, this Court "[a]s the reviewing court . . . will not overturn the trial court's ruling under Section 2403 [of the Evidence Code] unless there is a clear abuse of discretion." Tansy v. Dacomed Corp., 1994 OK 146, ¶ 31, 890 P.2d 881, 889 (emphasis added) (citing Gabus v. Harvey, 1984 OK 4, ¶ 24, 678 P.2d 253, 257; Jones v. Stemco Mfg. Co., 1981 OK 10, 624 P.2d 1044). "A trial court has broad discretion in deciding whether the value of the proffered evidence outweighs the prejudice to the defendant. . . . The decision of the district judge will be accorded 'great deference' because his first-hand exposure to all the evidence and his familiarity with the course of the trial proceedings are the best qualifications for balancing the value of the evidence in its proper context." Jordan v. Cates, 1997 OK 9, ¶ 20, 935 P.2d 289, 293--94 (emphasis added) (quoting Young v. Rabideau, 821 F.2d 373, 377 (7th Cir. 1987)). This is particularly true in a bench trial. See, e.g., Kendall v. Sharp, 1967 OK 66, ¶ 12, 426 P.2d 707, 709 ("The trial court was sitting without a jury, and this court has many times held that in a trial to the court the admission of evidence is largely discretionary. In the absence of a showing that the court's discretion was abused or that the parties were substantially prejudiced, the ruling of the trial court will not be disturbed." (citing Rivers v. Parker, 1963 OK 120, 382 P.2d 16; Reynolds v. Reynolds, 1943 OK 133, 137 P.2d 914)). If we truly afford broad discretion and great deference, then the trial court did not err in admitting evidence of the prior accusations. But even assuming error, the admission of such evidence was harmless because its exclusion would not undermine the trial court's judgment, which is amply supported by Child's disclosure to Adoptive Mother alone.

¶37 Regarding the fourth element about failure to protect, there is clear and convincing proof that Adoptive Mother failed to take reasonable action to remedy the sexual abuse that happened or to prevent future sexual abuse. After confronting Adoptive Father, Adoptive Mother went about business as usual. She did not send Adoptive Father packing or contact local police. Instead, her work schedule at a local fast-food restaurant compelled her to continue leaving Child in Adoptive Father's care when school was out for spring break.[22] By all appearances, it seems she chose either not to believe Child's accusations or to ignore them--even though she knew of at least one other accusation of sexual abuse against Adoptive Father that she also shrugged off. Moreover, when interviewed by Detective McCavitt and informed about the general nature of Child's accusations of inappropriate tickling, Adoptive Mother chose to conceal from police her knowledge about the weeks-old incident involving jock-itch medication.[23] When Ms. Frisby later asked Adoptive Mother why she hadn't mentioned the incident to Detective McCavitt, Adoptive Mother lied by saying the incident had slipped her mind.[24] As Child's attorney argued in his closing statement, Adoptive Mother's excuse that she "just forgot" is "absurd":

I haven't forgotten from the first moment I read it, and she's not my child. There's no way she [i.e., Adoptive Mother] forgot about that. She was just simply trying to bargain her way out of this situation and keep the status quo and hope that nothing bad happened out of it.[25]

On top of the initial failure to act and the cover-up, Adoptive Mother never took steps to distance herself from Adoptive Father until approximately two weeks before trial--even though she attended classes about sexual abuse and admitted to seeing red flags regarding Adoptive Father's apparent pattern of sexual abuse.[26] Up to that point, she lived with him and repeatedly asked Child during phone calls whether Child wanted to speak with him.[27] All of her conduct leaves this Court with a firm conviction that Adoptive Mother failed to protect Child from heinous and shocking abuse insofar as she "lie[d], conceal[ed,] . . . fail[ed] to report," and "fail[ed] to take reasonable action to remedy or prevent" such abuse.

¶38 Looking at the final element on best interests, we hold it was reasonable for the factfinder to form a firm belief or conviction that termination of Adoptive Mother's parental rights was in Child's best interests. The evidence already discussed demonstrates that Adoptive Mother doesn't understand her duty to take reasonable steps to protect Child from sexual abuse. The DHS permanency worker, Ms. Wood, testified that Adoptive Mother never has expressed belief in Child's accusations against Adoptive Father and that she thought Adoptive Mother's motivation in discussing the possibility of leaving Adoptive Father was solely to get custody of Child again.[28] Consequently, Ms. Wood did not feel like Adoptive Mother has the protective capacity to keep Adoptive Father away from Child in the future or to protect Child in other scenarios.[29] No evidence of a pending divorce action between Adoptive Mother and Adoptive Father was presented at trial, and this Court takes judicial notice of the fact that no such action has been filed in an Oklahoma court. See supra note 7. For all these reasons, Ms. Wood thought it would not be in Child's best interests to allow Adoptive Mother to work a plan for reunification and recommended that Adoptive Mother's parental rights be terminated.[30] We would agree that this evidence constitutes clear and convincing proof that termination of Adoptive Mother's parental rights was in Child's best interests.

C. The Trial Court Did Not Err in Admitting the DVD 
Recording of Child's Forensic Interview. 

¶39 For her third and final argument, Adoptive Mother asserts that "the Trial Court erred in considering the DVD of the minor child's forensic interview." Appellant's Br. 6. She faults the trial court for "fail[ing] to rule on the competency of the child witness in the recorded interview and the reliability of the witness was not ascertained on the record for possible meaningful review." Id. at 6 (internal quotation marks omitted). Adoptive Mother argues a ruling on the record regarding Child's competency and reliability is required under both section 2803.1(A) of the Oklahoma Evidence Code and a case she cites as "In the Matter of P.F., 2005 OK [sic] 50, 118 P.3d 224." Appellant's Br. 6--7 & n.23. In reality, Adoptive Mother has misattributed the case she cites to this Court when, in fact, it is a non-precedential opinion from COCA--i.e., State v. Frazier (In re P.F.), 2005 OK CIV APP 50, 118 P.3d 224. Section 2803.1(A) generally governs the admissibility of certain children's out-of-court statements about physical or sexual abuse over an objection to hearsay. At the time of Adoptive Mother's bench trial in this case, section 2803.1 provided in relevant part:

§ 2803.1 Statements of children not having attained 13 years or incapacitated persons describing acts of physical or sexual contact--Admissibility in criminal and juvenile proceedings

A. A statement made by a child who has not attained thirteen (13) years of age . . . , which describes any act of physical abuse against the child . . . or any act of sexual contact performed with or on the child . . . by another, is admissible in criminal and juvenile proceedings in the courts in this state if:

1. The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and totality of circumstances surrounding the taking of the statement provide sufficient indicia of reliability so as to render it inherently trustworthy. In determining such trustworthiness, the court may consider among other things, the following factors: the spontaneity and consistent repetition of the statement, the mental state of the declarant, whether the terminology used is unexpected of a child of similar age . . . , and whether a lack of motive to fabricate exists; and

2. The child . . . either:

a. testifies or is available to testify at the proceedings in open court or through an alternative method pursuant to the provisions of the Uniform Child Witness Testimony by Alternative Methods Act or Section 2611.2 of this title, or

b. is unavailable as defined in Section 2804 of this title as a witness. When the child . . . is unavailable, such statement may be admitted only if there is corroborative evidence of the act.

B. A statement may not be admitted under this section unless the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at least ten (10) days in advance of the proceedings to provide the adverse party with an opportunity to prepare to answer the statement

. . . .

12 O.S.2021, § 2803.1(A)--(B) (amended 2023). Adoptive Mother argues that the trial court "still need[ed] to comply with the statutory requirements in 'qualifying' the child witness as to believability and trustworthiness." Appellant's Br. 6. The Frazier case cited by Adoptive Mother held that a "reliability and trustworthiness hearing" and a "determination of whether the child was available to testify . . . were a necessary predicate to admission of [certain] hearsay statements" under section 2803.1 and reversed the trial court's deprived adjudication due to what COCA deemed a fundamental error arising from the trial court's failure to conduct such a hearing. Frazier, 2005 OK CIV APP 50, ¶¶ 30, 46--48, 118 P.3d at 229--30, 233.

¶40 Adoptive Mother admits that her trial attorney stipulated to the admissibility of the forensic interview on DVD. Appellant's Br. 6. Nonetheless, Adoptive Mother argues that such stipulation "was contingent on [the trial] Court making specific findings concerning the child's ability and believability and mak[ing] the perfunctory rulings." Id. at 7. Based on her reliance on the Frazier case and arguments about fundamental error that she made much earlier in her brief when discussing the applicable standard of review, Adoptive Mother would presumably contend that she has not waived this alleged error. See id. at 2 ("This Court may review claims which relate to due process of law. . . . Such fundamental error is reviewable even if the error has been raised for the first time on appeal.").

¶41 In response, Appellees point out that Adoptive Mother only complains about admission of the recorded forensic interview, but not the hearsay statements made by Child to which the DHS social worker or Child's therapist testified. Appellees' Br. 15--16. Appellees argue "[t]he trial court's failure to hold the statutorily required hearing does not mandate an automatic reversal" because "[t]he appellate court can review whether the failure to have the hearing, or the admission of the evidence substantially influenced the outcome of the trial." Id. at 14. In support of this contention, Appellees cite two cases from the Court of Criminal Appeals involving section 2803.1--i.e., Simpson v. State, 1994 OK CR 40, 876 P.2d 690, and J.J.J. v. State, 1989 OK CR 77, 782 P.2d 944. Id. at 14 n.60. Appellees also invoke the more specific statute governing the "[a]dmissibility of prerecorded statements of child age 12 or under who is victim of abuse" found in section 1-4-505 of the Oklahoma Children's Code, and then proceed to discuss how each of the nine statutory requirements--including "sufficient indicia of reliability," the absence of attorneys, the accurate preservation of audio and video, the identification of every voice on the recording, the lack of leading questions, etc.--was demonstrated during Adoptive Mother's bench trial. Id. at 15--18 & nn.67--72, 76--80 (citing 10A O.S.2021, § 1-4-505 and testimony of the forensic interviewer, the DHS social worker, and Child's therapist). Appellees then distinguish the Frazier case on the basis "that with or without the required reliability hearing, the video recording of the forensic interview" in that case "would have failed the trustworthiness test." Id. at 18. In contrast to the COCA holding in Frazier, Appellees submit three cases from the Court of Criminal Appeals for our consideration--i.e., the J.J.J. case previously referenced; Revilla v. State, 2019 OK CR 30, 456 P.3d 609; and Gordon v. State, 2019 OK CR 24, 451 P.3d 573. Id. at 18--19. In particular, Appellees note that in Gordon "[t]he appellate court ruled that the trial court's failure to hold the required hearing constituted harmless error since it did not have a substantial influence on the outcome of the trial." Id. at 19. Appellees then discuss how "[t]he Trial Court in this case did make findings consistent with the statutory requirements during her ruling and a determination was made that the forensic interview statements were 'credible' and 'truthful.'" Id. at 20 & nn.85--87, 89 (citing ROA p.000306, Trial Tr. 5--7, Aug. 29, 2022). Appellees conclude their response to this alleged error by submitting that any error "would be harmless error, as the evidence indicates that the forensic interview was conducted in such a manner as to ensure its reliability and trustworthiness, and therefore, was properly admitted into evidence . . . . [and] did not substantially influence the outcome of the trial." Id. at 21.

¶42 Turning to the applicable law cited by the parties, we must initially ascertain the controlling statute under which the alleged error occurred. Adoptive Mother references section 2803.1 of the Oklahoma Evidence Code, the language of which has been set forth above, see supra ¶ 39; but Appellees point us to section 1-4-505 of the Oklahoma Children's Code instead. At the time of Adoptive Mother's bench trial in this case, section 1-4-505 provided as follows:

§ 1-4-505. Admissibility of prerecorded statements of child age 12 or under who is victim of abuse

A. This section shall apply only to a proceeding brought within the purview of the Oklahoma Children's Code in which a child twelve (12) years of age or younger is alleged to be deprived, and shall apply only to the statement of that child or another child witness.

B. The recording of an oral statement of the child made before the proceedings begin is admissible into evidence if:

1. The court determines in a hearing conducted outside the presence of the jury that the time, content and totality of circumstances surrounding the taking of the statement provide sufficient indicia of reliability so as to render it inherently trustworthy. In determining trustworthiness, the court may consider, among other things, the following factors: the spontaneity and consistent repetition of the statement, the mental state of the declarant, whether the terminology used is unexpected of a child of similar age or of an incapacitated person, and whether a lack of motive to fabricate exists; and the child either:

a. testifies or is available to testify at the proceedings in open court or through an alternative method pursuant to the provisions of the Uniform Child Witness Testimony by Alternative Methods Act or Section 2611.2 of Title 12 of the Oklahoma Statutes, or

b. is unavailable as a witness as defined in Section 2804 of Title 12 of the Oklahoma Statutes. When the child is unavailable, such statement may be admitted only if there is corroborative evidence of the act;

2. No attorney for any party is present when the statement is made. However, if appropriate facilities are utilized that allow observation of the child without the child's knowledge or awareness in any way, any such attorney may be present as an observer, but not as a participant, and no such attorney shall have any right to intervene, object, or otherwise make his or her presence known to the child before, after, or during the making of the statement of the child;

3. The recording is both visual and aural and is recorded on film or videotape or by other electronic means;

4. The recording equipment is capable of making an accurate recording, the operator of the equipment is competent, and the recording is accurate and has not been altered;

5. The statement is not made in response to questioning calculated to lead the child to make a particular statement or is otherwise clearly shown to be the child's statement and not made solely as a result of a leading or suggestive question;

6. Every voice on the recording is identified;

7. The person conducting the interview of the child in the recording is present at the proceeding and is available to testify or be cross-examined by any party;

8. Each party to the proceeding is afforded an opportunity to view the recording before the recording is offered into evidence; and

9. A copy of a written transcript of the recording transcribed by a licensed or certified court reporter is available to the parties.

A statement may not be admitted under this subsection unless the proponent of the statement makes known to the parties an intention to offer the statement and the particulars of the statement at least ten (10) days in advance of the proceedings to provide the parties with an opportunity to prepare to answer the statement.

10A O.S.2021, § 1-4-505, amended by Act of April 29, 2022, ch. 104, § 1, 2022 Okla. Sess. Laws Serv. 318, 318--19 (West effective Nov. 1, 2022). Section 1-4-505 appears in Title 10A of the Oklahoma Statutes, which generally contains the "Children and Juvenile Code"; but section 2803.1 of the Evidence Code appears in Title 12, which generally governs "Civil Procedure." Moreover, whereas section 2803.1 generally governs the admissibility in criminal and juvenile proceedings of hearsay testimony about a child's statements concerning sexual abuse, section 1-4-505 of the Children's Code specifically governs the admissibility in juvenile deprived proceedings (like this case) of a child's statements concerning sexual abuse that are captured on an audio-visual recording prior to the proceeding (like the DVD recording of Child's forensic interview). Due to this difference, section 1-4-505 contains many more requirements for admissibility--mostly concerning the reliability of the recording itself--that are not included in section 2803.1.

¶43 Upon review of both provisions, we agree with Appellees that section 1-4-505 is the governing statute because Adoptive Mother only complains about the admission of the DVD recording of Child's forensic interview. Section 1-4-505 is more specific here than section 2803.1. When two statutes are in conflict, it is a well-established principle that the more specific enactment will control. Brown v. Creek Cty. ex rel. Creek Cty. Bd. of Cty. Comm'rs, 2007 OK 56, ¶ 9, 164 P.3d 1073, 1076 (citing Scruggs v. Edwards, 2007 OK 6, ¶ 14 n.11, 154 P.3d 1257, 1263 n.11; Phillips v. Hedges, 2005 OK 77, ¶ 12, 124 P.3d 227, 231); Gardner v. Sch. Dist. No. 87, Kay Cty., 1912 OK 544, ¶¶ 4--7, 126 P.1018, 1021 (quoting Atchison, Topeka & Santa Fe R.R. v. Haynes, 1899 OK 87, ¶ 0, 58 P. 738, 738; Territory ex rel. Sampson v. Clark, 1894 OK 57, ¶ 6, 35 P. 882, 885; Crane v. Reeder, 22 Mich. 322, 334--35 (1871); G.A. Endlich, A Commentary on the Interpretation of Statutes § 216, at 288--89 (1888)). But for our purposes, it doesn't particularly matter which of the two statutes we utilize because Adoptive Mother only challenges the trials court's failure to conduct a hearing and determine the trustworthiness of Child's statements. Both section 1-4-505 of the Children's Code and section 2803.1 of the Evidence Code contain identical provisions requiring "a hearing conducted outside the presence of the jury" to find "sufficient indicia of reliability so as to render [the child's statements] inherently trustworthy," § 1-4-505(B)(1); § 2803.1(A)--something that's been true since 1984 when both provisions were initially enacted.[31] Thus, we can look to case law discussing either statute.

¶44 We must first assess whether the trial court committed error. Insofar as the trial court failed to conduct the statutorily required hearing despite the stipulations from Adoptive Mother's trial attorney, we find the trial court committed error. The best practice is to conduct the required hearing even if a stipulation to admissibility has been made.

¶45 Next, we must ascertain whether the trial court's error constitutes fundamental error or merely plain error. Adoptive Mother has not raised a constitutional error. Rather, she has raised an error which occurred as a result of the trial court's failure to adhere strictly to the dictates of a state statute. In other words, she has not raised a fundamental error that unquestioningly "compromises the integrity of the proceeding" or undoubtedly results in "a miscarriage of justice." If anything, Adoptive Mother has simply demonstrated a plain error insofar as she complains that the trial court failed to check certain boxes procedurally by not holding a separate hearing at which certain findings were made. Thus, we find the error was plain error, such that Adoptive Mother must also prove prejudice. See Dougherty, 2018 OK 77, ¶ 25, 428 P.3d at 889; Duke, 2020 OK 6, ¶ 27, 457 P.3d at 1082.

¶46 As to prejudice, Adoptive Mother has failed to allege that Child's testimony was unreliable or incompetent or that the forensic interviewer was unqualified or asked leading questions. Consequently, there is nothing for this Court to point at and characterize as prejudice that resulted in a miscarriage of justice or in the denial of a fair trial.[32]

¶47 Rather, as Appellees discuss in their brief, the evidence adduced at trial demonstrated that each of the statutory requirements in section 1-4-505 of the Oklahoma Children's Code had been met and that the trial court had made the necessary findings--just not in a separate hearing. On the requirement in paragraph 1 of section 1-4-505(B) for sufficient indicia of reliability, the forensic interviewer, Amy Baum, testified that Child was consistent in her statements throughout the interview,[33] that Child's statements were spontaneous at times,[34] that Child "really show[ed] her credibility" when she corrected herself or Ms. Baum,[35] that there were no signs Child had a motive to fabricate accusations,[36] and that Child used age-appropriate language and terminology during the interview.[37] Detective McCavitt testified that Adoptive Father's statements during his police interview corroborated Child's disclosures, particularly insofar as he utilized the same hand gesture when discussing Adoptive Mother's confrontation of him as what Child had shown Ms. Baum during the forensic interview.[38] Child's therapist, Brandy Guidry, also corroborated Child's disclosures insofar as she testified Child told her during a counseling session about "massaging" Adoptive Father's penis.[39] Although Child was not called to testify at trial, the record indicates that Child was available to testify and that the trial court was operating under the assumption that Child might be called to testify.[40] Regarding the requirement in paragraph 2, Ms. Baum indicated in her testimony that no attorneys were present during Child's forensic interview. She was the only person in the room with Child, and Ms. Frisby and a doctor were the only people watching the forensic interview live through a closed-circuit TV.[41] With respect to the requirement in paragraph 3, Ms. Baum testified that the recording was both "video" and "audio" (i.e., visual and aural).[42] For the requirement in paragraph 4, Ms. Baum testified that the DVD admitted as State's Exhibit No. 1 "accurately portray[ed] the forensic interview."[43] Regarding the requirement in paragraph 5, Ms. Baum indicated that she always tries to conduct interviews with open-ended questions or multiple-choice questions rather than leading or suggestive questions.[44] Moreover, Adoptive Mother has not highlighted any leading questions that Ms. Baum asked during the forensic interview, nor did this Court observe any in its review of the DVD recording. For the requirement in paragraph 6, Ms. Baum indicated that the only two voices on the recording are hers and Child's insofar as they were the only two people in the interview room.[45] With respect to the requirement in paragraph 7, Ms. Baum was present at the proceeding, where she testified and was cross-examined.[46] For the requirements in paragraph 8 and 9, Appellees posit that "[t]here is no indication in the record that each party was not given the opportunity to view the video of the interview prior to the trial, or that a written transcript of the recording was requested and not available." Appellees' Br. 16. Thus, the trial transcript demonstrates that the trial court's ultimate decision to admit the DVD recording was not made in error, and that the failure to conduct a separate hearing caused no prejudice to the outcome of the trial.

¶48 Furthermore, the trial court's ruling included several findings related specifically to child's credibility. The trial court found that "[t]he testimony and evidence presented was that there appeared to be no coaching of the child."[47] The trial court also observed that "the individual that did the forensic interview found the child to be highly credible." [48] Finally, the trial court observed that the "testimony of the detective, the LPC [i.e., licensed professional counselor] and the MSW [i.e., an individual with a master's in social worker] spoke of the child not being coached, being truthful in her statements."[49] Thus, even though the trial court didn't make such rulings during a separate hearing, the necessary rulings about Child being "credible" and "truthful" were eventually made.

¶49 Presumably, the lack of prejudice in this trial is the reason Adoptive Mother's counsel stipulated to the State's motion regarding admissibility of the DVD recording of Child's forensic interview and subsequently told the trial court "[n]o objection" when the State eventually moved to admit the DVD.[50] Whatever his trial strategy was, this Court will not second-guess it by discerning some form of "inherent" prejudice where no prejudice has been demonstrated. Nor will we tolerate Adoptive Mother's attempt to "lay[] behind the log" here. See Tatum v. State (In re E.J.T.), 2024 OK 14, ¶ 22, 544 P.3d 950, 959 ("[L]itigants represented by counsel who complete pre-trial discovery, appear at trial never objecting to non-jury trial or demanding a jury trial, and only after losing demanded a jury trial are often referred to as 'laying behind a log.' Such practices are generally met with disfavor in the courts." (footnote omitted)); In re Sara O., 1993 OK 10, ¶ 8 n.4, 847 P.2d 768, 770 n.4 ("The concept [of laying behind the log] is to intentionally decline to reveal an argument at the proper time and then later 'spring it' on an opponent."). Thus, we find that Adoptive Mother has waived this issue on appeal.

¶50 Our conclusion that Adoptive Mother has failed to present a fundamental error of which we may take cognizance is in harmony with all of the case law cited by both sides. Said another way, we agree with the reasoning in Simpson v. State, 1994 OK CR 40, 876 P.2d 690, and J.J.J. v. State, 1989 OK CR 77, 782 P.2d 944, and find State v. Frazier (In re P.F.), 2005 OK CIV APP 50, 118 P.3d 224, distinguishable, as well as non-precedential. The present case is more akin to the Court of Criminal Appeals' Simpson and J.J.J. cases and less like COCA's non-precedential Frazier case. All three cases involved the trial court's failure to conduct the statutorily mandated hearing; but the former two cases contained no evidence of prejudice, whereas the latter case did. Because Adoptive Mother has also failed to present any evidence of prejudice to the outcome of her trial, we reach the same result as Simpson and J.J.J.

IV. CONCLUSION

¶51 In conclusion, we reaffirm our holding in Rodriguez v. State (In re M.R.), 2024 OK 28, 548 P.3d 120, and reject Adoptive Mother's arguments that the trial court erred by not applying ICWA's heightened burden of proof. She lacks standing to challenge the constitutionality of ICWA, but even if she had standing, her equal protection claim would fail because ICWA's heightened burden is based on a preference that is political (i.e., tribal membership) rather than racial. We also hold that the trial court did not err in finding the State presented clear and convincing evidence to support termination of Adoptive Mother's parental rights, because the evidence is such that the trial judge as factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. Finally, we hold that Adoptive Mother waived her final alleged error concerning the admissibility of the DVD recording of Child's forensic interview insofar as her attorney stipulated to its admission without objection and Adoptive Mother failed to present any evidence of actual prejudice resulting from its admission. Although plain error occurred and the trial court should be admonished to adhere to the hearing requirements in 10A O.S.2021, § 1-4-505(B)(1), the error was harmless--particularly insofar as the record on appeal demonstrates that the trial court had ample evidence to support findings that would satisfy the requirements of section 1-4-505(B)(1) through (9).

JUDGMENT OF THE DISTRICT COURT AFFIRMED.

ROWE, V.C.J., and KAUGER, WINCHESTER, EDMONDSON, COMBS, GURICH, and DARBY, JJ., concur.

KANE, C.J., concurs in the result.

KUEHN, J. (by separate writing), concurs in part and dissents in part.

FOOTNOTES

[1] ROA p.000038, Biological Mother's Mot. to Release & Disclose Confidential Records 2, Apr. 18, 2022.

[2] ROA p.000013, Emergency Custody Hr'g Order 2, Mar. 25, 2022.

[3] ROA p.000016, id. at 5.

[4] ROA p.000029, Emergency Custody Hr'g Order 5, Mar. 28, 2022.

[5] ROA pp.000035--000036, Pet. 1--3, Apr. 1, 2022.

[6] DHS's actions in this regard should be understood through a review of applicable law. See generally 10A O.S.2021, § 1-4-908(A)(2)(d) ("At any time prior to or following the adjudicatory hearing the court, on its own motion or upon the motion of a party, may find that reasonable efforts to prevent the removal of a child from home or to reunify the child and family are not required if the court determines, based upon a preponderance of the evidence, that: . . . 2. The parent or legal guardian of the child has: . . . d. subjected any child to aggravated circumstances including, but not limited to, heinous and shocking abuse, or heinous and shocking neglect; . . . ."); Okla. Admin. Code. § 340:75-6-44(b) ("(b) Permanency planning for the case with heinous and shocking or reasonable efforts not required findings. When the district attorney files a petition or motion to terminate parental rights based on heinous and shocking abuse or neglect or the court makes a finding that reasonable efforts are not required to reunify the child and family, efforts immediately begin to secure an alternative permanent home for the child." (emphasis added)).

[7] At trial, Child's foster mother would testify that, when Adoptive Mother and Child would speak on the telephone, Adoptive Mother would often ask Child about putting Adoptive Father on the phone. According to Child's foster mother, this continued until August 13th or 14th, at which point Adoptive Mother stated over the phone that she wasn't living with Adoptive Father anymore. This timeline was corroborated by trial testimony from DHS's permanency worker, who said she believed Adoptive Mother moved out two weeks before the trial. Nevertheless, Adoptive Mother's intentions remain unclear as she has never given DHS proof that she moved out or that she has cut off contact with Adoptive Father. At the trial, DHS's permanency worker didn't even know where Adoptive Mother was living. We also take judicial notice of the fact--as did the trial court--that neither Adoptive Mother nor Adoptive Father has filed a divorce action in an Oklahoma court. See ROA p.000302, Tr. of Proceedings 8:13--:15 ("To date, as far as this Court is aware, mother is still married to father and this Court acknowledges that no divorce has been filed.").

[8] ROA p.000121, Notice of Intent to Use Child Hearsay Statements 1, Aug. 8, 2022. An amended notice was filed August 16th, which included other recordings that the State thought it might use at trial; but those recordings were not used at trial and are therefore of no consequence to this appeal. See ROA p.000161, Am. Notice of Intent to Use Child Hearsay Statements 1, Aug. 16, 2022.

[9] See ROA p.000125, Mot. to Allow Child Witness to Testify by Alternative Method 1, Aug. 8, 2022; ROA p.000145, State's Subpoena to Child 1, Aug. 10, 2022; ROA pp.000175--000176, Mot. to Limit Exam. of Child Witness to Age Appropriate Language, Grammar & Sentence Structure 1--2, Aug. 19, 2022.

[10] ROA p.000187, Adjudication/Disposition Order 8, Aug. 19, 2022.

[11] Id.

[12] See ROA pp.000202--000203, Order Terminating Parental Rights 2--3, Aug. 30, 2022. The State ultimately filed criminal charges against Adoptive Father a year later, on August 18, 2023. See State v. McCubbin, No. CF-2023-3684 (Okla. Cty. Dist. Ct. filed Aug. 18, 2023). At the arraignment in October of 2023, Adoptive Father pled not guilty. The preliminary hearing has not yet occurred.

[13] ROA p.000306, Trial Tr. 5:13--6:10, Aug. 29, 2022.

[14] Id. at 251:17--:21, Aug. 31, 2022.

[15] ROA p. 000227--000230, Order Terminating Parental Rights 3--6, Oct. 11, 2022; see also ROA p.000302, Tr. of Proceedings 4:8--9:1, Oct. 6, 2022.

[16] The identical arguments from both this case and the Rodriguez case were advanced by the same appellate attorney (representing appealing parents in both cases), and were countered by the same assistant district attorney (representing the State in both cases) and the same assistant public defender (representing the children in both cases).

[17] The only Appellee in this case is the State, but Child's attorney joined the State's appellate brief. To avoid the repeated use of cumbersome references to "the State and Child," this opinion will refer to them collectively as "Appellees" and to their brief as "Appellees' brief" or "Appellees' Br."

[18] During the State's direct examination of Ms. Frisby, the DHS social worker, the State never asked her to get into the details of the allegations. See ROA p.000306, Trial Tr. 26:5--28:17, Aug. 29, 2022 (merely describing "a previous referral for [Child] for threat of harm because Mr. McCubbin had been accused of sexually abusing a child that Brandi was nanny for"; a second "referral attached where he had allegedly sexually abused a child that she was a nanny for"; and a third "screened-out referral regarding sexual abuse of a child in Texas that Mr. McCubbin had been involved with as well"). Similarly, Child's attorney never asked for details. See id. at 50:10--53:3. It wasn't until cross-examination by Adoptive Mother's counsel that Ms. Frisby shared more details about the underlying accusations in the prior Texas incident. See id. at 59:5--60:19 (wherein Ms. Frisby disclosed that the 2014 incident reported in Texas in 2018 involved Adoptive Father showing pornography to a child whom Adoptive Mother was babysitting and "masturbating in front of that child while porn was being watched" and that she didn't know the specific allegations regarding the 2019 incident in Oklahoma).

The details about the prior Oklahoma incident didn't come to light during the bench trial, but the record on appeal contained an affidavit completed by Ms. Frisby and attached to the State's application to take Child into emergency custody that recited the details of that 2019 incident. See ROA pp.000004--000006, Frisby's Child Prot. Servs. Aff. 1--3, Mar. 23, 2022 (stating that "Mr. McCubbin has been the suspect in two prior child molestation cases involving minors. One in 2019 in OK County where a child made a disclosure to her parents that Mr. McCubbin made her touch his penis but did not disclose in the forensic interview so no charges were filed. . . .").

[19] Section 1-4-904 of the Oklahoma Children's Code provides in relevant part:

Section 1-4-904. Termination of parental rights in certain situations

A. A court shall not terminate the rights of a parent to a child unless:

1. The child has been adjudicated to be deprived either prior to or concurrently with a proceeding to terminate parental rights; and

2. Termination of parental rights is in the best interests of the child.

B. The court may terminate the rights of a parent to a child based upon the following legal grounds:

. . . .

9. A finding that the parent has abused or neglected any child or failed to protect any child from abuse or neglect that is heinous or shocking;

. . . .

[20] The Juvenile Instructions of the Oklahoma Uniform Jury Instructions were revised in September of 2022, shortly after this case was tried, to reflect statutory amendments that went into effect in November of 2021. See In re Amends. to OUJI-Juv., 2022 OK 74; Act of May 11, 2021, ch. 473, §§ 1--2, 2022 Okla. Sess. Laws Serv. 1612, 1613, 1615 (West) (amending § 1-4-904(B)(9) effective Nov. 1, 2021). Consequently, it is best for us to cite the statutes for the applicable substantive law, as they were in effect when the State filed its petition in this case. That said, the current jury instructions amended since the trial also reflect the applicable statutory law.

[21] ROA p.000306, Trial Tr. 254:15--:24, Aug. 31, 2022.

[22] ROA p.000306, Trial Tr., State's Ex. 2, Police Interview 0:12:55--0:13:39.

[23] See ROA p.000306, Trial Tr. 117:24--122:2, Aug. 30, 2022.

[24] Id. at 49:2--:22, Aug. 29, 2022.

[25] Id. at 260:19--:25, Aug. 31, 2022.

[26] Id. at 157:25--158:20, 180:19--181:18, Aug. 30, 2022.

[27] Id. at 155:15--158:20, 181:16--182:1.

[28] Id. at 199:24--202:24, Aug. 30, 2022.

[29] Id. at 202:3--:15.

[30] ROA p.000306, Trial Tr. 184:20--185:15, Aug. 30, 2022.

[31] Compare Act of Mar. 12, 1984, ch. 8, § 1, 1984 Okla. Sess. Laws 106, 106 (codified at 12 O.S.Supp.1984, § 2803.1(A)), with Act of Apr. 9, 1984, ch. 111, § 1, 1984 Okla. Sess. Laws 369, 369 (codified at 10 O.S.Supp.1984, § 1147(B)(1); renumbered 1995 as 10 O.S.Supp.1995, § 7003-4.2(B)(1); renumbered 2009 as 10A O.S.Supp.2009, § 1-4-505(B)(1)).

[32] Adoptive Mother would apparently have this Court presume prejudice from the adverse judgment entered against her. Such a finding would be flawed for two reasons. First, such a presumption would relieve Adoptive Mother of her burden of proof to demonstrate prejudice in relation to the plain error. Second, an "adverse verdict does not, without more, demonstrate that [an appellant] was deprived of a fair trial." Ward v. Morrison, 2018 OK CIV APP 36, ¶ 18, 417 P.3d 1257, 1262; see also Thompson v. Presbyterian Hosp., Inc., 1982 OK 87, ¶ 27 n.26, 652 P.2d 260, 267 n.26 (collecting cases from other jurisdictions standing for the proposition that "[a]n adverse verdict without more does not demonstrate that the offended party was deprived of a fair trial" but ultimately rejecting those jurisdiction's approach to the specific context of a trial court's allowance of additional peremptory challenges where no showing was made of a serious dispute among codefendants because this Court viewed such error as a fundamental error where no showing of prejudice was required). The prejudice cannot be the resulting judgment, but something else that inescapably and unfairly led the factfinder to the resulting judgment--such as allegations that Child used adult words that demonstrate coaching, or that the forensic interviewer asked leading questions, etc.

[33] ROA p.000306, Trial Tr. 96:24--97:8, Aug. 30, 2022.

[34] Id. at 97:9--:11.

[35] Id. at 97:12--:17.

[36] Id. at 97:18--:23.

[37] Id. at 95:3--:9.

[38] Id. at 119:12--121:5.

[39] Id. at 218:21--219:22, Aug. 31, 2022.

[40] See, e.g., id. at 5:25--6:14, Aug. 29, 2022 (wherein the trial judge stated she "w[ould] ensure that if the child is called to testify, we will determine alternative means, whether the easiest be that she appear in the jury room or in some other location for virtual" (emphasis added)); see also ROA p.000145, State's Subpoena to Child 1, Aug. 10, 2022 (commanding Child "to appear before the District Court of Oklahoma County . . . and report to the District Attorney's Office, Suite #301 on the 29TH DAY OF AUGUST, 2022, at 8:30 am to testify" at trial).

[41] ROA p.000306, Trial Tr. 99:6--100:2, Aug. 30, 2022.

[42] Id. at 86:12--:19.

[43] Id. at 88:2--:12.

[44] Id. at 83:3--:17.

[45] Id. at 84:21--:25.

[46] See id. at 75:21--109:16.

[47] ROA p.000302, Tr. of Proceedings 7:3--:8, Oct. 6, 2022.

[48] Id. at 7:8--:10.

[49] Id. at 7:15--:17.

[50] ROA p.000306, Trial Tr. 88:14--:23, Aug. 30, 2022; see also supra note 13 and accompanying text.

 

 

KUEHN, J., CONCURRING IN PART AND DISSENTING IN PART:

¶1 I agree that the trial court applied the correct burden of proof, and that the evidence was sufficient to support termination of McCubbin's parental rights. I take issue only with the Majority's analysis of McCubbin's claim that consideration of the child's video interview was error.

¶2 McCubbin claims the trial court erred in considering the child's forensic video interview without first holding a hearing to consider factors bearing on the reliability of the evidence. Such a hearing is provided for in both 10A O.S. § 1-4-505(B)(1) and 12 O.S. § 2803.1(A)(1). The requirements under each statute differ slightly, but as the Majority notes, the differences are immaterial for purposes here. Both provide that, before certain out-of-court statements concerning child abuse can be admitted into evidence, the court should hold a hearing, "outside the presence of the jury," to determine whether the evidence is reliable enough for the jury's consideration.

¶3 Simply put, no such hearing was necessary in this case. The trial court's role in these hearings is to be a gatekeeper -- to assess the evidence against certain legal factors before a jury is allowed to receive it. But this presupposes that there is, in fact, a lay jury which needs to be shielded from evidence with questionable reliability. McCubbin waived her right to a jury and she stipulated to admission of the recording. In short, she asked the trial court to sit as factfinder, and she affirmatively waived any legal objection to the court considering the DVD.

¶4 On appeal, McCubbin claims her stipulation was "contingent on" a ruling on the recording's reliability. She does not point to any part of the record supporting such a reservation.[1] The argument is nonsensical in any event. McCubbin's stipulation was not to the contents of the recording; it was specifically a waiver of any challenge to its admissibility.[2] In short, McCubbin invited the court to consider the DVD along with all the other evidence. Even McCubbin concedes that in these circumstances, an admissibility hearing would have been "perfunctory" -- or as the Majority describes it, a matter of "check[ing] certain boxes." Majority at ¶ 45.

¶5 Just as parties are free to stipulate to facts, they are free to waive objections to the admissibilty of evidence. But along with the agency to make such strategic decisions comes accountability for the consequences. It is disingenuous for a party to relieve the trial court of having to make admissibility findings, then complain on appeal that such findings are absent from the record. Any so-called "error" in this situation is invited, and an inconsistent position on appeal will not be entertained. See Union Texas Petroleum et al. v. Corp. Comm'n, 1981 OK 86, ¶ 36, 651 P.2d 652, 663-64.

¶6 I have two disagreements with the Majority's analysis here. First, for the reasons given above, the trial court did nothing wrong when it accepted McCubbin's invitation to consider the recording. I disagree with the Majority's assertion that the "best practice" is to hold such a hearing even when admissibility is not challenged. There is simply no logical reason for doing so. Even if this had been a jury trial, a response of "No objection, Your Honor" when the State offered the recording would have been sufficient to dispense with the need for any in camera hearing. And the Majority ultimately agrees (at ¶ 49) that McCubbin "waived" any challenge to admissibilty by not objecting below.

¶7 But before finding waiver, the Majority (at ¶ 47) essentially holds the hearing that the trial court did not. Again, such a hearing is only necessary when the trial is before a jury, and the party not offering the evidence actually objects to admissibilty. But even if the trial court here had erred in failing to hold the hearing, I believe the Majority's analysis sets a bad example. It is not the appellate court's role to conduct its own post hoc admissibility hearing and make a judgment that the trial court was much better suited to make. Instead, the appellate court should simply determine whether the evidence was so prejudicial that the failure to pre-test it cannot be deemed harmless. See Gordon v. State, 2019 OK 24, 451 P.3d 573, 588 (Kuehn, J., Concurring in Part and Dissenting in Part at ¶¶ 5-6). To be sure, a harmless-error analysis will touch on many of the same factors relevant to admissibility, such as whether the proffered information is consistent with the rest of the evidence. And indeed, the trial court itself made a detailed record in this case on why it found the child's statements in the interview to be "credible" and "truthful."[3] I simply believe it is bad practice for an appellate court to try to do the trial court's job after the fact, and I therefore dissent to that part of the Majority opinion.

FOOTNOTES

[1] See Atlas Life Ins. Co. v. Unger, 1947 OK 23, ¶ 20, 177 P.2d 98, 102 (party's claim that its trial stipulation was for a limited purpose was rejected as lacking support in the record).

[2] Strictly speaking, parties may only stipulate to the existence of a fact, which dispenses with the need to present any evidence at all on the matter. See State ex rel. Okla. Bar. Ass'n v. Groshon, 2003 OK 112, ¶ 8, 82 P.3d 99, 103 ("A stipulation of fact is an agreement by the parties that a particular fact (or facts) in controversy stands admitted. It serves as an evidentiary substitute that dispenses with the need for proof of facts that are conceded by the parties' agreement. Stipulations are subject to the approval of the court in which they are entered"). While parties can stipulate to certain facts, they cannot stipulate to "conclusions of law or the legal effect of stipulated facts." Keota Mills & Elevator v. Gamble, 2010 OK 12, ¶ 19 n.31, 243 P.3d 1156, 1162 n.31. In this case, the goal was not to keep the State from presenting the recording altogether, but simply to forgo any challenges to whether the interview was reliable enough for the court to consider. McCubbin's action is more accurately labeled an affirmative waiver of any challenge to admissibility, rather than a stipulation.

[3] "[T]he trial court made the necessary findings [on admissibility] -- just not in a separate hearing." Majority at ¶ 47.

 

 

 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases

 
Cite
Name
Level

 
1989 OK CR 77, 782 P.2d 944, 
J.J.J. v. STATE
Discussed at Length

 
1994 OK CR 40, 876 P.2d 690, 
SIMPSON v. STATE
Discussed at Length

 
1979 OK CR 10, 594 P.2d 771, 
BURKS v. STATE
Discussed

 
2011 OK CR 15, 255 P.3d 425, 
ROBINSON v. STATE
Discussed at Length

 
2019 OK CR 24, 451 P.3d 573, 
GORDON v. STATE
Discussed at Length

 
2019 OK CR 30, 456 P.3d 609, 
REVILLA v. STATE
Discussed

 
1982 OK CR 152, 651 P.2d 1064, 
DUNGAN v. STATE
Discussed

 
1985 OK CR 140, 709 P.2d 207, 
DAVIS v. STATE
Discussed

Oklahoma Court of Civil Appeals Cases

 
Cite
Name
Level

 
2005 OK CIV APP 50, 118 P.3d 224, 
IN THE MATTER OF P.F.
Discussed at Length

 
2018 OK CIV APP 36, 417 P.3d 1257, 
WARD v. MORRISON
Discussed

 
1998 OK CIV APP 118, 964 P.2d 241, 69 OBJ 2949, 
In the Matter of M.K. and L.K.
Discussed

Oklahoma Supreme Court Cases

 
Cite
Name
Level

 
1990 OK 89, 801 P.2d 703, 61 OBJ 2374, 
D.D.F., Matter of
Discussed

 
1993 OK 10, 847 P.2d 768, 64 OBJ 576, 
Termination of Parental Rights, Matter of
Discussed

 
2001 OK 6, 18 P.3d 342, 72 OBJ 355, 
STARKS v. STATE
Discussed

 
1947 OK 23, 177 P.2d 98, 198 Okla. 234, 
ATLAS LIFE INS. CO. v. UNGER
Discussed

 
1994 OK 146, 890 P.2d 881, 65 OBJ 4192, 
Tansy v. Dacomed Corp.
Discussed

 
1997 OK 9, 935 P.2d 289, 68 OBJ 485, 
Jordan v. Cates
Discussed

 
1953 OK 381, 265 P.2d 467, 
OKLAHOMA TRANSP. CO. v. PHILLIPS
Discussed

 
2001 OK 97, 39 P.3d 791, 72 OBJ 3408, 
PIERCE v. PIERCE
Discussed

 
1960 OK 40, 354 P.2d 415, 
MISSOURI-KANSAS-TEXAS RAILROAD COMPANY v. JONES
Discussed

 
1963 OK 120, 382 P.2d 16, 
RIVERS v. PARKER
Discussed

 
1967 OK 66, 426 P.2d 707, 
KENDALL v. SHARP
Discussed

 
1968 OK 38, 441 P.2d 350, 
ROBERTS v. LEWIS
Discussed

 
1968 OK 114, 444 P.2d 812, 
HUTTON v. LOWRY
Discussed

 
1969 OK 104, 460 P.2d 903, 
SISLER v. JACKSON
Discussed

 
1972 OK 97, 499 P.2d 380, 
TEAGUE v. UNITED TRUCK SERVICE
Discussed

 
1973 OK 141, 516 P.2d 534, 
KARRIMAN v. ORTHOPEDIC CLINIC
Discussed

 
2002 OK 83, 64 P.3d 1080, 
IN THE MATTER OF S.B.C.
Discussed at Length

 
2003 OK 112, 82 P.3d 99, 
STATE ex rel. OKLAHOMA BAR ASSOCIATION v. GROSHON, JR.
Discussed

 
2005 OK 77, 124 P.3d 227, 
PHILLIPS v. HEDGES
Discussed

 
2006 OK 80, 155 P.3d 1, 
IN THE MATTER OF THE ADOPTION OF L.D.S.
Discussed at Length

 
2007 OK 6, 154 P.3d 1257, 
SCRUGGS v. EDWARDS
Discussed

 
2007 OK 56, 164 P.3d 1073, 
BROWN v. CREEK COUNTY
Discussed

 
2008 OK 16, 179 P.3d 1265, 
IN THE MATTER OF THE ESTATE OF SPEERS
Discussed

 
1996 OK 125, 932 P.2d 1100, 67 OBJ 3566, 
Neil Acquisition, L.L.C. v. Wingrod Investment Corp.
Discussed

 
2010 OK 12, 243 P.3d 1156, 
KEOTA MILLS & ELEVATOR v. GAMBLE
Discussed

 
1894 OK 57, 35 P. 882, 2 Okla. 82, 
Territory ex rel. Sampson v. Clark
Discussed

 
2010 OK 39, 236 P.3d 116, 
IN THE MATTER OF THE ADOPTION OF BABY BOY A
Discussed

 
2010 OK 81, 243 P.3d 21, 
IN THE MATTER OF C.D.P.F.
Discussed at Length

 
2012 OK 5, 272 P.3d 705, 
COVEL v. RODRIGUEZ
Discussed

 
2015 OK 36, 373 P.3d 1022, 
IN THE MATTER OF T.T.S.
Cited

 
1978 OK 94, 580 P.2d 983, 
MATTER OF CHAD S.
Discussed at Length

 
1979 OK 95, 596 P.2d 891, 
SABOURI v. HUNTER
Discussed

 
1980 OK 119, 615 P.2d 287, 
Adoption of Darren Todd H., Matter of
Discussed at Length

 
2017 OK 58, 398 P.3d 323, 
IN THE MATTER OF B.K.
Discussed

 
2018 OK 77, 428 P.3d 881, 
IN THE MATTER OF J.L.O.
Discussed at Length

 
2019 OK 24, 441 P.3d 138, 
DOBSON TELEPHONE CO. v. STATE EX REL. OKLAHOMA CORPORATION COMM.
Cited

 
2020 OK 6, 457 P.3d 1073, 
DUKE v. DUKE
Discussed at Length

 
2020 OK 63, 466 P.3d 559, 
IN THE MATTER OF L.M.A.
Discussed at Length

 
2022 OK 74, 
IN RE AMENDMENTS TO OKLAHOMA UNIFORM JURY INSTRUCTIONS-JUVENILE
Cited

 
2022 OK 91, 524 P.3d 942, 
FARRIS v. MASQUELIER
Discussed

 
2024 OK 14, 544 P.3d 950, 
IN THE MATTER OF E.J.T.
Discussed

 
2024 OK 28, 548 P.3d 120, 
IN THE MATTER OF: M.R.
Discussed at Length

 
1981 OK 10, 624 P.2d 1044, 
Jones v. Stemco Mfg. Co., Inc.
Discussed

 
1981 OK 86, 651 P.2d 652, 
Union Texas Petroleum, A Div. of Allied Chemical Corp. v. Corporation Com'n of State of Okl.
Discussed

 
1981 OK 131, 637 P.2d 66, 
C. G., Matter of
Discussed at Length

 
1982 OK 40, 643 P.2d 306, 
J. B., Matter of
Discussed

 
1982 OK 47, 645 P.2d 498, 
L. B., In re
Discussed

 
1982 OK 87, 652 P.2d 260, 
Thompson v. Presbyterian Hosp., Inc.
Discussed

 
2000 OK 82, 13 P.3d 484, 71 OBJ 2668, 
IN THE MATTER OF A.M. & R.W.
Discussed at Length

 
1998 OK 48, 961 P.2d 801, 69 OBJ 2135, 
SULLIVAN v. FORTY SECOND WEST CORP.
Discussed

 
1899 OK 87, 58 P. 738, 8 Okla. 576, 
ATCHISON TOPEKA & SANTA FE R.R. Co. v. HAYNES
Discussed

 
1943 OK 133, 137 P.2d 914, 192 Okla. 564, 
REYNOLDS v. REYNOLDS
Discussed

 
1912 OK 544, 126 P. 1018, 34 Okla. 716, 
GARDNER v. SCHOOL DIST. NO. 87
Cited

 
1984 OK 4, 678 P.2d 253, 
Gabus v. Harvey
Discussed

Title 10. Children

 
Cite
Name
Level

 
10 O.S. 1147, 
Renumbered as 10 O.S. § 7003-4.2 by Laws 1995, HB 1978, c. 352, § 199, emerg. eff. July 1, 1995
Cited

Title 12. Civil Procedure

 
Cite
Name
Level

 
12 O.S. 2803.1, 
Statement by Child or Incapcitated Person Describing Certain Acts - Admissibility
Discussed at Length

 
12 O.S. 2801, 
Definitions
Cited

Title 21. Crimes and Punishments

 
Cite
Name
Level

 
21 O.S. 1123, 
Lewd or Indecent Proposals or Acts to Child Under 16
Cited

Title 85. Workers' Compensation

 
Cite
Name
Level

 

Important Information Concerning 2011 Amendments to Title 85
Cited

 
 

 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA